# COURT OF APPEALS,

## Oct., 1912

## THE PEOPLE v. JOSEF RAZEZICZ.

### (206 N. Y. 249.)

(1.) MURDER—CIRCUMSTANTIAL EVIDENCE.

In determining a question of fact from circumstantial evidence, there are two general rules to be observed: (1) The hypothesis of delinquency or guilt should flow naturally from the facts proved, and be consistent with them all; (2) the evidence must be such as to exclude, to a moral certainty, every hypothesis but that of defendant's guilt of the offense imputed to him, or, in other words, the facts proved must all be consistent with and point not only to his guilt but they must be inconsistent with his innocence.

(2.) SAME.

Where evidence is of sufficient probative force a crime may be established by circumstantial evidence, but where the principal circumstance urged from which to infer guilt is wholly based upon an underlying circumstance or inference the testimony is unsatisfactory, since no reliable inference can be drawn from premises which are themselves uncertain.

(3.) SAME—RECORD OF TRIAL OF DEFENDANT, CONVICTED OF MURDER, EXAMINED, AND HELD THAT THE CONVICTION RESTS UPON CIRCUMSTANTIAL EVIDENCE WHICH IS NOT SUFFICIENTLY CLEAR AND CONCLUSIVE TO JUSTIFY THE CONVICTION.

Defendant was indicted and convicted of murder in the first degree for the killing of a man, in whose family he was a boarder, by means of the explosion of a bomb near a pump in the open yard of the house where they lived. Evidence was given for the purpose of showing that defendant prepared and placed the bomb at the point where it exploded, with homicidal intent toward the person who was killed by the explosion, and that a motive therefor existed in his alleged familiarities with the wife of the deceased. On examination and analysis of the evidence, held, that while the testimony presented to the jury includes very many facts that are consistent with the defendant's guilt, there is no one fact or series of facts which points inevitably thereto, and that singly and combined they are consistent with defendant's innocence and the evidence is inconclusive as to his guilt. Hence the inferences from the facts shown are not sufficiently

conclusive to exclude all other inferences and to justify the judgment of conviction.

(4.) SAME.

Evidence was given tending to show but not directly establishing defendant's knowledge of the manufacture of and connection with explosives for the purpose of drawing an inference that he was the author of the crime in question. *Held*, insufficient for that purpose under the rule that when circumstantial evidence is relied on the circumstances must be proved and not presumed; that every inference must stand upon some clear, direct evidence and not upon some other inference or presumption.

(5.) SAME.

Authorities as to the probative force of circumstantial evidence collated and considered.

APPEAL from a judgment of the Supreme Court, rendered December 22, 1911, at a Trial Term for the county of Genesee, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*William E. Webster* and *Newell K. Cone,* for appellant.

The verdict was contrary to law and clearly against the evidence. (Allen v. Kirk, 47 N. W. Rep. 906.)

*William H. Coon,* District Attorney, for respondent.

CHASE, J.:

A few minutes before seven o'clock on the morning of September 15, 1911, Theodore Czarniejewski was killed by the explosion of a bomb near a pump in an open yard at the corner of Sumner and South Swan streets in the outskirts of the village of Batavia.

The deceased was a Polish Russian. He married in Russia and came to this country, and to Batavia, with his wife about

four and a half years before his death.· In 1910 they moved into a small house facing Sumner street, on a large open lot which included the open yard at the corner of Sumner and South Swan streets. The family consisted of the deceased and his wife, Stella, and their little child about three years of age. They had two boarders, Stanislaus Yadzinski, a brother of Stella, and the defendant, who together occupied the only room and bed on the second floor of the house. ·

The only person living who saw the explosion is Stella, the widow of the deceased. Her evidence as to the occurrence and the facts immediately preceding and following the explosion are as follows:

" Friday morning, the day of the explosion, my husband got up first, he made the fire in the stove. About 10 or 15 minutes after Theodore got up I got up and went into the kitchen." She testified that her brother and the defendant came down stairs a little later, and that she got breakfast for them. She then testified that her husband took a pail and went to the pump for water, " and he saw that the barrel was fall down, and then he whistled for me come and brother says ' Stella, he call you,' and then I went; I went down the steps and then he made with the hand ' Come on,' ' Come on,' then I went ' Look,' my husband said ' Look at the barrel, it was standing up and now it is fall down, here is laying a box and a bag," and then my husband took the barrel and put it on end. And then my husband says ' Look on that box which is laying there,' and then we look on that box. Then Theodore said ' We have to look what kind is that box.' Then I said ' Don't take that in your hands. It might be something bad in there.' I said ' I will see with my foot what is there,' and I touched it with my foot, and it was heavy and that box turned once and second and then the box stopped. The box looks like a tin can from tomatoes,  *  · *  *·. A little bit thinner, smaller. There was a newspaper around this object.  *  *  *  There was a string around it.  *  *  *

"Around the circumference of the can. * * * I just touched it. * * *. My husband break the paper open like this and it made the explosion. * * * Then when my husband teared the paper on that can, then it exploded and it strike me on the whole face and on half of me, and in the feet. Then I did not see nothing, because it goes in my eyes. I was blind. * * * I never saw my husband after that minute. When I looked at the package, when Theodore pulled the paper off what I saw inside the paper looks like a dark—like cement dark color like cement."

The defendant is a Lithuanian Russian. He came to this country and to Batavia in April, 1910, and from that time until the time of the explosion was engaged as a woodworker at a factory referred to in the testimony as the "woodworks." The defendant commenced boarding at the house of the deceased February 7, 1911, and remained there as a boarder from that time until May 25, 1911, when he had some controversy with Stella in regard to his washing and he was told by her with the approval of her husband to seek another boarding place, which he did. Between that time and June 26, 1911, Stella's brother, Stanislaus, came from Russia and boarded with the deceased and his wife. It is not very clear whether the defendant suggested that he return to board with Theodore and Stella, or whether the suggestion came from them, or perhaps from the brother of Stella. On the evening of June 26, 1911, Theodore and Stella with her brother, Stanislaus, were at a saloon where they met the defendant and some conversation was had which resulted in the defendant returning to board with Theodore and Stella. A part of the conversation was about the bed and the defendant expressed a desire for a better one than he had had, and offered to advance ten dollars to purchase it. The contract for board was simply an agreement that the defendant should have his room with Stanislaus and that Stella should care for the room and cook for him the food which he should furnish,

17

and he was to pay therefor $3.50 per month. The ten dollars was advanced and it seems to be assumed that such advancement by the defendant paid his board with Theodore and Stella as stated until after the explosion.

The People were unable to produce any direct evidence as to who made the bomb, or who placed it near the pump where it was at the time of the explosion. One week prior to the explosion there had been two other explosions following one another with an interval of about a minute in another part of the village about one-half mile from Sumner and South Swan streets. The first one was on the porch of a house and store of an Italian named Colaizze. It tore a hole in the side of the house and the floor and ceiling of the porch. The second one tore a hole in the cement sidewalk. A piece of yellow pasteboard, cylindrical in shape, was found after the explosion. It was the only substance identified as being a part of the bombs that were exploded. It did not have the appearance of the outside paper of a dynamite stick. Colaizze was then foreman in the work of building a sewer in the village, and an Italian named Ricci had at one time been the foreman on the work. A few days before the explosion that killed Theodore he (Ricci) had moved an old house on a vacant lot near Sumner and South Swan streets, and had commenced placing a foundation under it. On the morning of the explosion a fellow-workman of the defendant went to one of the peace officers of the village and told him that about two months before the defendant fired a bomb in a grove near the Tonawanda creek. The defendant told some of the officers of the village that Ricci and other Italians had taken water from the pump to be used in mixing the cement in building the foundation under the house mentioned, and that the pump was broken and Theodore had to repair it, and that he was angry and swore. The defendant, Ricci, and the other Italian, the tenant in the building under which Ricci was building a foundation, were arrested, each charged with

the crime of killing Czarniejewski. After the preliminary examination Ricci and the other Italian were discharged, and each left Batavia. The defendant was indicted and tried and found guilty of murder in the first degree. From the judgment of conviction this appeal is taken.

After the explosion ten slugs were taken from the person of Theodore, four from the person of Stella, and many others from the hole in the ground made by the explosion, and also from the surrounding property; one was found more than a quarter of a mile away from the place where the explosion occurred. These slugs each consist of a small, irregular piece of an imitation babbitt metal. No wood, glass, plaster of paris or other substance other than such slugs and the powders and paint on them hereafter mentioned that could have been a part of the bomb were found. On some of the slugs was discovered a very small quantity of a white and also of a yellow powder. On several of them was a green paint. Experts examined the slugs and applied different tests, and from their report it is reasonably certain that on such slugs was a small quantity or trace of chlorate of potash, sulphur, and of plaster of paris. The person of Theodore was horribly mutilated, but on one side of the face and on one ear were certain grayish markings that the experts testified were, or at least may have been, burns by nitric acid. It also appears with reasonable certainty that chlorate of potash in a dry, granulated form, when mixed with some lighter carbonaceous substance, like sawdust and with sulphur, may be ignited with nitric acid and produce an explosion of greater strength and power than a similar quantity of dynamite. Not every combination of chlorate of potash, sulphur and of a light carbonaceous substance will explode as expected or planned when nitric acid is applied. Such combination makes a powerful explosive, but one that is somewhat uncertain in practical use and not generally used or prepared for commercial purposes. It is the theory of the prosecution that the bomb

consisted of chlorate of potash and sulphur mixed with small pieces of paper, and that such substances, together with the slugs, were rolled in or held together by plaster of paris or placed in a box covered by plaster of paris and that a bottle of nitric acid, uncorked, was so placed that the acid would not run from the bottle as it was deposited as a part of the bomb, near the pump, until the bomb was moved, and that when the bomb was touched by the foot of Stella and turned over, the acid ran out upon the other substances, and the explosion occurred within a few seconds.

The People produced testimony from which it was successfully urged before the jury that the defendant was familiar with explosives; that he had, or had an opportunity to obtain, the materials with which to make the bombs; that he made and placed the bomb where it was found; that there was a motive which induced him to kill Theodore and that he was guilty of the homicidal act. On the night preceding the explosion the defendant received a letter from his father which is in evidence. The letter made him sad and he was in tears. That evening he, with others, was at the house of a sister of Stella in the village where they studied English lessons from books and instruction papers received from a correspondence school. The defendant remained sad while at the house of Stella's sister and he said his father had been injured. He said he had talked with his father and brother by telephone at an expense of more than six dollars. He admits that he did not telephone them as stated, and that he received his information by letter. He explains that he stated to them that he had talked with his father and brother so that they would not ask him to see the letter from his father which, in substance, accused him of being an undutiful son. There was some discussion that evening at the house of Stella's sister about the lessons being too hard for them and that it would be better to get easier lessons before they made any further payments, and in the interest of all of them the defendant

wrote to the correspondence school. He also wrote a letter to his father and a letter, as a favor, for one of the others present. Before he finished these letters, and about nine o'clock, Stanislaus went home, and the defendant told him he could take his bicycle along, which he did. The defendant remained and finished the letters and left the house about ten o'clock. Stella says that she heard him come into the house half or three-quarters of an hour after Stanislaus came in. Just before dark on the night before the explosion, Theodore and Stella had used the pump to obtain water to put on their garden and when they left to go to the house the bomb was not there, and a barrel in which they kept water near the pump was standing in its usual place. It is claimed by the People that there was an opportunity for the defendant to place a bomb by the pump when he returned alone to Theodore's house and that he waited to return alone that he might leave the bomb there when no one was present to see him. It is urged that the defendant thought that by leaving the bomb there at that time it would attract the attention of Theodore in the morning, when according to the testimony he usually, but not always, went to the pump to get a pail of water. The probability that if the bomb was left there on the ground Theodore would be the one to see and explode it was far from a reasonable certainty, because although it appears that Theodore usually went to the pump in the early morning for water, it also appears that Stella occasionally went to the pump in the morning for water. One witness says that he had seen her at the pump for water early in the morning at least twice a week. The defendant's knowledge on the subject was such that if he placed the bomb by the pump he must have known that while Theodore would probably be the one to see and explode it, it was quite possible that Stella, the one whom, it is alleged, he so desired that he was willing to commit an awful crime that he might possess her, would be the one to see and explode it. It also appears that an iceman frequently stopped

at the pump to wash pieces of ice and that when he did so it was in the morning at an hour earlier than the time when Theodore usually went for water and also that the pump was entirely unprotected from the street and that boys and others went to it for water.

Very soon after the explosion a crowd gathered in and about the yard. The defendant was sitting on the steps of the house facing the yard. Two officers and the district attorney were near the defendant watching him and talking about him. Stanislaus, a brother of the deceased, and Stanislaus, the brother of Stella, were near and the defendant said to them, " What do they want from me ? " The deceased's brother said, " They have to look for that who could have done that," and the defendant said, " They look at me and I am not guilty." A short time after the explosion the two officers and district attorney with the defendant and two others as interpreters went to the defendant's room to see what they could discover. In the defendant's room was a basket in which he had brought clothing and personal property from Russia; in the basket was a bottle and on the floor another bottle each containing fluid; the defendant was asked in regard to the contents of the bottles and, referring to the bottle in which there was some undissolved powder with the liquid, said that he purchased the powder at a named drug store two or three weeks before the explosion; he said he used the liquid for sore throat. Referring to the other bottle he said it contained nitric acid that he purchased to clean rust from his bicycle, but that he had not cleaned his bicycle with it up to that time. He told where he purchased it. On a stand in the room was found an old paper-bound book of writing paper partially filled with receipts, prescriptions and formulas in the defendant's handwriting. The defendant said that he wrote the receipts, etc., in Russia, and they have the appearance of having been written long before the time of the explosion. In the basket was also found a pocket note book; in

the note book was a piece of paper containing the words "kalium chloricum;" marked on the book were also the words "salt aceit." in defendant's handwriting. There was found a letter on the back of which was written the words "nitric acid" and "kalium chl." The defendant said that he wrote them. The nitric acid bottle was nearly or quite full. One witness says that it was full and that nothing had been taken out. In the book is a formula for different kinds of gun powder, but no formula for an explosive such as that of which the bomb in question was made.

The fellow-workman of the defendant (Dudkiewicz) who notified the police that the defendant had fired a bomb on Tonawanda creek, testified that on July 15 he was on the bank of Tonawanda creek fishing. The place was in a large field that was open to view except for a ridge running across it covered with trees. He testified that soon after he commenced fishing he was in the bushes obscured from view and saw the defendant coming along a path and enter the grove on the right at a point about 200 feet from him and that he passed out of sight. He testified that about ten minutes afterwards he heard a terrific explosion at about the point where the defendant entered the grove. He waited for about ten minutes after the explosion and then to ascertain what had occurred walked down the stream and saw another man fishing. He went to the man and talked with him for five or ten minutes and then returned. Soon afterwards he saw the defendant come out of the grove at the point where he entered it. When the defendant arrived near him he asked, "What was the explosion?" and he testified that the defendant blamed it right on him and said, "It was you that done the explosion;" and the witness replied, "No you came from there you must have done it." The witness testified that the defendant's face was pale and he appeared nervous. After the defendant left the field the witness went into the grove and found a hole in the ground several inches deep and about

two feet in diameter where the dirt had been freshly disturbed and the surrounding trees were torn and broken. Subsequently several pieces of tin were picked from the bruises in the trees and two small pieces of charcoal were found near the hole. The witness had had some prior discussion and disagreement with the defendant on religious matters, after which they seldom spoke to each other.

Three of the defendant's fellow-workmen testified to his taking plaster of paris from the supply furnished by their employer. Each refers to a different time. One testified that six weeks or two months before the explosion he saw the defendant take a pound and a half or two pounds of plaster of paris and put it in a paper which he then placed in his coat. Another testified that about two months before he took about five pounds of plaster of paris from a barrel and gave it to the defendant; and the third testified that a few weeks before he took plaster of paris from a barrel and gave it to the defendant.

Three witnesses testified, one, that he saw the defendant during the regular hours of employment in the shop make a box or apparatus of wood which was about five or six inches long and about one and a half inches in diameter; another that about three weeks before the explosion he saw the defendant at the shop making a wooden device about eight inches long and two inches in diameter; and the third that he saw the defendant at the shop making a box about six inches long and two inches square with a hole in it about an inch square, and at another time a box of about the same dimensions of a solid piece of wood with a hole bored into the center of it about four inches deep. Another witness testified that about six weeks before the explosion the defendant asked him in German what the name "swavel" was in English, and that he told him "sulphur." He says that the defendant asked him if he could get it at a drug store, and the witness replied that he could. He also testified that a few days afterwards the defendant asked him the Eng-

lish word for " salt zair." The witness testified that he did not know the word and so stated to the defendant.

The fisherman referred to in connection with the testimony of Dudkiewicz testified that he heard the explosion but did not see any one other than the witness Dudkiewicz.

During the summer the defendant had worked over hours for a junk dealer who was building a house near Theodore's. While there he had access to imitation babbitt metal, green paint and burlap bags.

The evidence on which the alleged motive is based consists of the testimony of Stella. It is in no way corroborated. She testified that the defendant at different times sought to gain her love and repeatedly proposed that she leave her husband and go away with him. It is the contention of the prosecution that the defendant hoped that by killing Theodore he would gain his wife.

The defendant had frequent opportunity to be at home with Stella when her husband was away. The defendant's work commenced at 7:30 in the morning and closed at five in the afternoon. Theodore worked at another factory and his work commenced at seven in the morning and closed at six in the afternoon. She testified to three occurrences while the defendant was a boarder at the house the first time. On the first of these occasions he had been requested to get some wine for Stella by her husband. He returned in her husband's absence with the wine and oranges while she was in bed in her room. He entered the room and offered her the oranges which she refused and he then gave her the wine. She told him not to come to the bedroom and turned her face away with her back to him, whereupon the defendant kissed her and she told him again that he should not kiss her and to get out of the room.

On the second occasion in the morning following a discussion which she had with Theodore in regard to the child, the defendant after Theodore left for his work referred to her hus-

band quarreling with her and said that after he gets older he will be worse, and suggested that if she would go away with him it would be better for her because she had a cranky man. She testified that she refused to leave with him and said to him that she would not leave her husband and baby for anything in the world.

On the third occasion she testified that she had said in the morning that she was tired and had no appetite to eat her breakfast and her husband said: "You always are sick and when are you going to be well?" and after her husband left the defendant said in substance that her husband did not care for her, and then suggested "if you only left your husband and go away with me you would do better." Soon after returning to board with Theodore and Stella the second time, she says that he took hold of her hand in the kitchen when she was reaching for a dipper and that she struck him in the face with the dipper. At another time he attempted to pull her upon his lap; and that at one time he came home when she was working with the sewing machine and shook her chair and after some conversation he tried to kiss her and that she threatened to strike him in the face with the scissors. On another occasion he came home and went to the pump for water and brought the water in and her testimony as to what occurred is as follows: "He said how is the housekeeper? I bring the water; how much am I worth of that, that I bring the water? You the worth of that that you are going to wash yourself. He says that his is worth of a kiss, and then he tried to kiss, and then I struck him with the elbow in his nose; then when I struck him in the nose then he had the nose so red, and he was so mad and asked me what for I strike him. What did I done to you that you strike me. I don't want that you should kiss me that is all. The next day all day he don't say nothing he was mad." At another time defendant returned to the house and said that Theodore had been talking with the men in the shop about him. She testified that

he said that Theodore said to the men that he had changed his boarding place because he liked to fool with the women. The defendant said that her husband was a story teller and was very mad.

Stella further testified that when the defendant was there the first time he usually sat with them in the kitchen and they talked pleasantly together. She also testified that such pleasant relations continued for a week or two after his return the second time, and then the relations were not so pleasant. There was no quarrel between the deceased and the defendant, but she says that at the time of the explosion " Theodore was mad on Razezicz and Razezicz was mad on Theodore." About seven weeks prior to the explosion the defendant came home from his work and said to Stella: " What for you and your husband are so mad ? " Her testimony as to the conversation is as follows: " I said 'my husband ain't mad at you.' He said ' But I see that you are mad and your husband are mad at me, and what for are the door locked in the bedroom.' " She testified that she had a dresser in a sitting room in which she had letters and that she received a letter from her sister and that she found that the defendant had read it, and then she had the dresser put in the bedroom and a lock placed on the bedroom door. Her further testimony is as follows: " I don't want to see anybody in my bedroom and to look in the letters." Razezicz said: " About that letter you don't need to be mad because I told your sister only a few words." He says: " If your sister said anything and you would say to your sister then I would shoot to your sister—to you and to your sister and I would shoot to your heads from a revolver." At another time, a few weeks before the homicide, she testified that he said: " What for you are so mad ? Before you used to speak to me and now you don't want to speak at all to me. * * * Then if you won't go away and live with me, we will live right here just the same together." And then he says: " You would be a good woman if you only

would talk with me." I said to Razezicz: "I told you once that
you should behalf yourself. I don't want to speak with you.
Your business is to eat supper and go up stairs." She further
testified: " I answered him 'what do you think I am, what do
you understand? Do you understand that I am a different
woman?' Razezicz said that 'I ain't got you for a different
woman.' When I told him like that then he says he is sorry if
he came to board at my house. * *. * Razezicz said I would
go but I am now in the fifth different place; I am ashamed to
go any more and I will stay here." She further testified that
she said to him: "You go from board to board because you like
to fool with the womans!" She further testified that he said:
" That I am a good housekeeper and that I can sew. * * *
That I was a pretty woman, he said it. He told me that he was
a smart man. *. *..* He said that my husband and my
brother is crazy. I said to Razezicz ' You said that you are a
smart man and a learned man. Then I won't go with you away
if you go to school and learn another three years.'" Defendant
said to Stella that he had got four letters about her husband.
About fifteen or eighteen days before the explosion the defend-
ant complained to Stella because she had not boiled his milk and
it was sour, and she insisted that she had boiled it and that she
and her husband knew it. Her further testimony about the
occurrence is as follows: " He said ' I will stick for your hus-
band, and you are so cranky and mad. Now I don't care if any-
body is going to knock your husband in the head, then I don't
care, and I get for your husband four letters.' I said ' What
my husband is in fault, or what he done something?' Then he
said ' Let me knock his head off, I won't say anything then;
your husband is to me like nothing.' ".

While in the jail awaiting trial there was with him a young
boy, a Polander, confined on a charge of burglary. The boy
testified: " I was telling him they was going to kill him. I says
they got you for that man what you killed. They are going to

kill you, to give you chair. He says ' No, they can't give me no chair. They might give me twenty years and let me go. But I ain't sure they will let me go.' I said ' If you get twenty years that is life, " The boy also testified that the defendant once said to him that when the explosion occurred by the creek that he was going through there to sell things, and that at another time he said he was going through there to the woodworks. He also testified that the defendant said that it was but a little hole where the explosion was. He further testified that the defendant asked if Stella was going hard against him and that the defendant said: " If his (Theodore's) wife was going to go hard against him why he going to tell on her brother he done it."

The sheriff testified that while the defendant was in jail he had a conversation with him as follows: The defendant asked: " What do you think of my case ? " and that he replied: " I don't know what evidence the district attorney has against you," and that the defendant then said: " I think it is pretty bad. I think I get the chair."

From the mass of testimony we have selected the parts most relied upon by the people, and have recited them herein at unusual length, because it has seemed desirable in view of the fact that this appeal is to be determined upon the facts. The defendant admits much of the people's testimony — other parts of it he explains or denies.

Immediately after the explosion he helped Stella's brother take her into the house. He requested that a physician be sent for. but apparently was not understood by those to whom he spoke, and he ran up and down through the open yard " hollering." Soon after he went to the home of one of his countrymen and had him telephone for a physician. Dudkiewicz, who was not friendly with the defendant, told the officer of the explosion near Tonawanda creek, as stated within a half hour after the explosion that killed Theodore. That statement by Dudiewicz seems to have been the immediate cause of the discussion about

the defendant by the officers and of his arrest. After his arrest he was examined at length by the district attorney, and his testimony was taken by a stenographer; he was also a witness in his own behalf at the trial. He admitted that while in Russia he had been imprisoned for using a passport of another man, and that he was also convicted there of burglary in breaking into a store, although he explained that the act was merely breaking a window, and that he was only imprisoned for a few days. His statements and his testimony are consistent and in no way contradictory. He denies the statements of Stella so far as they charge him with improper conduct with, or suggestions to her, or any threats about her husband. Stella testified that she told her husband of the alleged conversations and acts of the defendant mentioned in the testimony, but there is no evidence of any dissent or criticism on his part, and he as well as Stella consented to the defendant's return as a boarder, although a part of the alleged familiarities were while he was a boarder the first time. He denies that he made the bomb that killed Theodore, or that he ever made a bomb or had a bomb in his possession, or that he placed a bomb in the yard or in the grove near Tonawanda creek. He denies that he ever took any of the imitation babbitt metal, green paint or a burlap bag from the junk dealer. He also denies the statements made by the young man who was with him in the jail, so far as such statements are inconsistent with his testimony as a witness, and so far as the young man testified that the defendant threatened to give testimony against Stella's brother. The statements made by him to the boy and to the sheriff expressing fear of being convicted are not surprising nor of special significance in view of his isolation, friendlessness and the statements that were made to him.

There is in the book mentioned a receipt for sore throat, which prescribes diluted chlorate of potash as a gargle. It appears that such a gargle is sometimes used. He admits that he purchased two ounces of chlorate of potash of a druggist in Batavia

and says that he took it to his boarding place and divided it and put it into two bottles, one of which was larger than the other. He testified that Stella gave him hot water, with which he filled the bottles in which he had placed the chlorate of potash, and that the smaller one of the bottles broke and the broken bottle and contents were thrown away, and that he kept the other bottle with the diluted chlorate of potash and used it for a gargle. The division of the chlorate of potash in the bottles and the fact that one of the bottles was broken is corroborated by Stella.

There is not the slightest evidence of the defendant's ever having purchased or having had in his possession any other chlorate of potash and it is uncontradicted that it would require a half pound of chlorate of potash to make the bomb in question. He says the bottle of nitric acid found in his room was in the same condition that it was at the time he purchased it. There is no evidence of the purchase of any other nitric acid. He explains that when he first went to the druggist for chlorate of potash he was unable to make him understand what he wanted and that the name was afterwards written on a slip of paper and he took the paper to the druggist at the time when he actually made the purchase. He also explains that he had the words " nitric acid " written on the paper before he went to purchase it, that he might thereby show the druggist what he wanted. He denies ever having had the possession of sulphur and no evidence of his purchase or possession of sulphur is shown.

The jury were not compelled to believe the tetimony of the defendant; but apart from the testimony of the defendant and the purchase of chlorate of potash and nitric acid, which he admits, there is no testimony that the defendant ever purchased or had any chlorate or acid in his possession.

He admits taking the plaster of paris from the shop on two occasions. He says that he took it on one occasion to repair the frame of a mirror for a man named by him, and the man so named corroborates the fact of his having the defendant repair

his mirror frame, and also that it was repaired with plaster of paris. He says that he took plaster of paris the other time to use in repairing a picture frame for a person named, but that person had removed from Batavia at the time of the trial and was not a witness. He denies that he made any box at the shop except one, a little larger in size than those mentioned, which box he admits he made at the shop for his personal use.

Great importance is placed by the people upon the testimony of Dunkiewicz in regard to the explosion near Tonawanda creek. The fact of an explosion is conceded. The defendant admits that he was near Tonawanda creek at the time of the explosion; he says that after leaving the woodworks he went to a junk dealer in that vicinity to find a pedal to take the place of a broken one on his bicycle, and that while passing along the stream he met Dunkiewicz, and that while standing by him the explosion took place. He denied any knowledge of or connection with the explosion, and he is corroborated in his evidence to the extent that he did go to the junk dealer's. There is no evidence of the composition of the bomb then exploded, except the possible connection with it of the small pieces of charcoal. The pieces of tin found in the bruises in the trees were apparently parts of the container in which the explosive material was carried. Dunkiewicz testified that when the defendant entered the grove he did not see that he had anything in his possession or that he carried a bomb or other substance, and the defendant's clothing was such at the time that it would have been difficult for him to conceal such a package. The testimony of the people to show that the defendant asked about acid, sulphur, salt zair and other things from which it is argued that he was preparing to make the bomb is of little value in connection with the claim that the defendant exploded the bomb at Tonawanda creek, and in view of the fact that substantially all such conversations were after July 15, when that bomb was exploded. If the defendant made and exploded a bomb near Tonawanda creek as claimed, much of the

testimony relating to conversations and acts by the defendant is immaterial. If he made and exploded that bomb he was quite familiar with elementary and other information in regard to bomb making. The only evidence upon which to reach the conclusion that the bomb exploded near Tonawanda creek was made and exploded by the defendant is circumstantial. The explosion of the bomb two months before the explosion that killed Theodore is in no way connected with the explosion that killed Theodore, except that if it is conceded that the defendant exploded that bomb it is evidence of the defendant's knowledge of and of his experimenting with explosives. Such evidence, if established, is not in itself proof of the crime of homicide, but at most evidence of a fact from which other facts tending to connect the defendant with the crime may be inferred.

Where evidence is of sufficient probative force a crime may be established by circumstantial evidence. In this case there is no direct evidence of the defendant's guilt. The testimony is wholly circumstantial. Where the principal circumstance urged from which to infer guilt is wholly based upon an underlying circumstance or inference the testimony is unsatisfactory.

In People v. Kennedy (32 N. Y. 141, 146) Chief Judge Denio, speaking for this court, says: " Circumstantial evidence, I repeat, consists in reasoning from facts which are known or proved, to establish such as are conjectured to exist; but the process is fatally vicious if the circumstance from which we seek to deduce the conclusion depends itself upon conjecture."

In People v. Harris (136 N. Y. 423, 429, 10 N. Y. Crim. 260) this court say: "All that we should require of circumstantial evidence is that there shall be positive proof of the facts from which the inference of guilt is to be drawn and that that inference is the only one which can reasonably be drawn from those facts."

In People v. Fitzgerald (156 N. Y. 253, 258, 13 N. Y. Crim.

36) this court say: " In attempting to prove a fact by circumstantial evidence there are certain rules to be observed that reason and experience have found essential to the discovery of truth and the protection of innocence. The circumstances themselves must be established by direct proof and not left to rest upon inferences. The inference which is to be based upon the facts and circumstances so proved must be a clear and strong logical inference, an open and visible connection between the facts found and the proposition to be proved."

" No inference being reliable which is drawn from premises which are themselves uncertain, whenever it is sought to establish a proposition by circumstantial evidence, the circumstances from which the inferences must be drawn must be themselves established by direct evidence, as if they were the very facts in issue, and must not be left to conjecture." (Ency. of Evidence, vol. 3, p. 70.)

Whenever circumstantial evidence is relied upon to prove a fact the circumstances must be proved and not themselves be presumed. (Manning v. John Hancock Mut. Life Ins. Co., 100 U. S. 693.).

In United States v. Ross (92 U. S. 281, 283) the court say: " They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable, drawn from premises which are uncertain. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed. Starkie on Ev. (p. 80) lays down the rule thus: ' In the first place, as the very foundation of indirect evidence is the establishment of one or more facts from which the inference is sought to be made, the law requires that the latter should be established by direct evidence, as if they were the very facts in issue.' It is upon this principle that courts are daily called upon to exclude evidence as too remote for the consideration of the jury."

In Lamb v. Union Railway Co. (195 N. Y. 260, 266) this court say: " It is a well-settled rule of law that you cannot base inference upon inference. (O'Gara v. Eisenlohr, 38 N. Y. 296; Ruppert v. Brooklyn H. R. R. Co., 154 N. Y. 90.) Every inference must stand upon some clear, direct evidence, and not upon some other inference or presumption."

When in a criminal action the people seek to prove a defendant guilty of the crime with which he is charged the courts allow testimony of all circumstances that may have a fair and legitimate influence in determining the question involved. In any case evidence of circumstances may be so remote as to have no legitimate influence in determining an issue. Such remote testimony tends rather to confuse and conceal the real issue and may result in improperly influencing the jury in determining the question presented to them. It is frequently said as we have quoted that inference cannot be based upon inference.

Such a rule is denied by Greenleaf (Greenleaf on Evidence [16th ed.], § 14), and the statements and illustrations by Greenleaf are repeated by Wigmore in his work on Evidence and by some others. Perhaps the weight, if any, to be given to such remote inferences should not be stated generally in the form of rules, but rather in each case by direct decision, or by applying the rules that relate to remote testimony. When testimony is remote it is of little value and when too remote from which to draw any legitimate conclusion it should be wholly rejected.

In this case while the testimony in regard to a bomb having been exploded near Tonawanda creek is properly in evidence the defendant's connection with it, if at all, is an inference, upon which inference the homicide is sought to be inferred. As such inference must be solely based upon an underlying inference it is unsafe and dangerous to rely upon it as the controlling fact to establish the defendant's guilt.

The mass of testimony presented to the jury includes very many facts that are consistent with the defendant's guilt. They arouse one's curiosity and suspicion, but do not convince the judgment. If in connection with the mass of testimony so received in evidence the people had evidence of some one fact pointing more directly and conclusively, although circumstantially, to the defendant's guilt, such as evidence of his possession of the bomb, or evidence that he was seen after he left the home of Stella's sister going in the direction of the pump with a package resembling the bomb the conclusion that the defendant is guilty could and would be sustained.

There is no one fact or series of facts that point inevitably to the defendant's guilt. The facts shown by the people singly and combined are consistent with the defendant's innocence. He was never seen engaged in making a bomb. He was never seen with a bomb in his possession. His conduct before and at the time of the explosion was not unusual.

Circumstantial evidence, as has been frequently remarked, is unsatisfactory, inconclusive and dangerous, or satisfactory, conclusive and safe according as it points to a certain result and is not inconsistent with any other result or conclusion.

In People v. Harris (supra) this court say: " Evidence, as I have suggested, is not to be discredited because circumstantial. It has often more reliable elements than direct evidence. Where it points irresistibly and exclusively to the commission by the defendant of the crime, a verdict of guilty may rest upon a surer basis than when rendered upon the testimony of eye witnesses; whose memory must be relied upon and whose passions or prejudices may have influenced their testimony." (p. 446.)

In People v. Bennett (49 N. Y. 137, 144) this court say: " In determining a question of fact from circumstantial evidence, there are two general rules to be observed: 1. The hypothesis of delinquency or guilt should flow naturally from the facts proved, and be consistent with them all. 2. The evidence must be such

as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him, or, in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence."

In People v. Place (157 N. Y. 584, 594, 13 N. Y. Crim. 474) this court, referring to the Harris case, say: " In that case it was in effect held that, while to justify a conviction for a crime upon circumstantial evidence, there must be positive proof of the facts from which the inference of guilt is to be drawn, and that inference must be shown to be the only one that can be reasonably drawn from the facts, yet, where the evidence, taken together, leads irresistibly and exclusively to a conclusion of guilt, with which no material fact to establish it is at variance, it constitutes the higher form of evidence, and may not be disregarded by court or jury. We recognize this as a proper statement of the law which is applicable in this case." (Ruppert v. Brooklyn H. R. R. Co., supra; People v. Fitzgerald, supra.)

In a criminal case circumstantial evidence to justify the inference of guilt must exclude to a moral certainty every other reasonable hypothesis. Circumstantial evidence in a criminal case is of no value if the circumstances are consistent with either the hypothesis of innocence, or the hypothesis of guilt; nor is it enough that the hypothesis of guilt will account for all the facts proven. Much less does it afford a just ground for conviction that unless a verdict of guilty is returned, the evidence in the case will leave the crime shrouded in mystery. (Ency. of Evidence, vol. 3, p. 92.)

The public interest and safety require that the perpetrator of the horrible crime should, if possible, be brought to justice, but our duty in connection therewith is no greater than our duty to protect the innocent. The defendant must be presumed innocent until he is proven guilty. The inferences from the facts shown are not sufficiently conclusive as we have seen to exclude all other inferences and to justify the judgment obtained against

him.   The testimony as a whole is consistent with the defendant's innocence.   It is to be hoped that with a new trial the defendant's guilt or innocence may be more clearly and conclusively established.

The judgment of conviction should be reversed and a new trial ordered.

Cullen, Ch. J., Vann, Werner and Willard Bartlett, JJ., concur; Haight, J., concurs in result; Gray, J., absent.

Judgment of conviction reversed, etc.