THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. ERNEST SUFFERN and Others, Appellants, Impleaded with PHILIP BARNES and Others, Defendants.

First Department, November 9, 1934.

*David L. Podell* of counsel [*Mortimer Hays, Mortimer Feuer* and *Henry Stone* with him on the brief; *David L. Podell*, attorney], for the appellant Ernest Suffern.

*Ulysses S. Grant* of counsel [*O. Arthur Stumpe*, attorney], for the appellants Bonowitz X. Dawson and David A. Dyche.

*Irving Jay Tell, Deputy Assistant District Attorney*, of counsel [*William Copeland Dodge, District Attorney*], for the respondent.

MARTIN, J.   The appellants and three other defendants, Emma Dawson, Herbert E. White and Philip Barnes, were indicted for a violation of section 580 of the Penal Law, which provides in part as follows:

" If two or more persons conspire:   *   *   *

" 4. To cheat and defraud another out of property, by any means which are in themselves criminal, or which, if executed, would amount to a cheat, or to obtain money or any other property by false pretenses;   *   *   *

" Each of them is guilty of a misdemeanor."

On April 20, 1933, the defendant Philip Barnes pleaded guilty to conspiracy.   The other five defendants were all brought to trial. By direction of the court the jury found the defendant Emma Dawson and the defendant Herbert E. White not guilty.   After a trial lasting fourteen days, the jury on June 28, 1933, rendered a verdict of guilty against the appellants Ernest Suffern, Bonowitz X. Dawson and David A. Dyche, and they were sentenced to the New York County Penitentiary.   The trial judge, however, granted a certificate of reasonable doubt to all the appellants.

The indictment charges that these defendants did on or about February 20, 1930, unlawfully and corruptly conspire to cheat and defraud one Ella Patterson out of property and to obtain from her by false pretenses 600 shares of the common stock of Curtis Publishing Company; that on March 4, 1930, in pursuance of the conspiracy, the defendants organized a certain corporation called General Industrial Foundation; that on June 4, 1930, the defendants, by falsely pretending that 2,000 shares of Class " A " common stock and 10,000 shares of Class " B " stock of the General Industrial Foundation were of the same value as 600 shares of stock of the Curtis Publishing Company, and by falsely pretending that the said General Industrial Foundation was a going concern, and by falsely pretending that the said General Industrial Foundation was about to erect an office building on the plot of the Hotel Belmont in New York, did induce Ella Patterson to deliver to the General Industrial Foundation the 600 shares of the Curtis Publishing Company and that afterwards the defendants did cause the General

Industrial Foundation to sell the 600 shares of Curtis Publishing Company stock and unlawfully caused the said corporation, General Industrial Foundation, to pay to the defendants the proceeds procured from said sale.

The complainant, Ella Patterson, the widow of William A. Patterson, had been bequeathed by her husband 3,000 shares of preferred stock of Curtis Publishing Company and 1,800 shares of common stock in the same company, the market value of which was more than $100 per share. The decedent requested that this stock should not be sold. There appears to have been a concerted effort by defendants to obtain that stock.

While the complainant was living in Red Bank, N. J., the defendant David A. Dyche called upon her and attempted to interest her in a gold mine. He said he had been sent by an old friend of Mr. Patterson, a man named Mr. White. Mr. White and Mr. Barnes also visited the complainant about the same proposition. Mrs. Patterson then referred them to her lawyer, a Mr. Parlin.

Thereafter, and on or about April 6, 1930, Mr. Dyche visited Mrs. Patterson again but this time he did not discuss the gold mine. He proposed that she invest in the General Industrial Foundation (a company in which the complainant invested and lost $480,000). Mr. Dyche informed her that this company intended to erect a building on the site of the Hotel Belmont and that it was interested in various other projects. He also mentioned that a Mr. Arthur Hibbard, who was known to Mr. Patterson, was a member of the board of directors. The names of other people who had known Mr. Patterson were also mentioned.

Mr. Dyche and Mr. Barnes saw Mrs. Patterson on April 18, 1930, and finally on May 23, 1930, Mrs. Patterson bought thirty-five shares of the stock of the General Industrial Foundation at the fictitious price of thirty-two dollars and fifty cents a share. On May twenty-fifth Mr. Dyche and Mr. Barnes explained to Mrs. Patterson that she could use her Curtis stock as collateral and buy more stock; that the General Industrial Foundation would hold the collateral, but would not sell it and Mrs. Patterson would receive the dividends.

Thereafter the other conspirators made their appearance. Mr. Dyche's sister, a Mrs. Dawson, and her husband, one of the appellants, called upon Mrs. Patterson. As a result of the many calls made upon her, Mrs. Patterson on June 4, 1930, turned over 600 shares of Curtis common stock to Mr. Barnes and an agreement respecting the stock was then signed. On July 9, 1930, Mrs. Patterson turned over to Mr. Suffern the balance of her stock, consisting of 2,400 shares of preferred and 1,200 shares of common.

It was agreed that this stock would be used as collateral and that an agreement concerning it would be drawn at a later date. The value of the Curtis stock, both common and preferred, was more than $100 per share.

An agreement concerning this stock was drawn up and signed on July 19, 1930. Mrs. Patterson had until that time been receiving the dividends on her Curtis stock, monthly on the common, quarterly on the preferred. It was arranged that the General Industrial Foundation would thereafter send monthly checks for the stock, so as to make a dividend equal to the *pro rata* share for both the common and the preferred amounting to about $2,550 per month. These checks were sent to Mrs. Patterson regularly until July, 1931, and then they were no longer paid. Mrs. Patterson then suspected something was wrong and investigated the matter with the result that the defendants were indicted.

In exchange for her Curtis stock Mrs. Patterson had been given shares of the common and Class B stock of the General Industrial Foundation. The only asset of that company was a worthless gold mine. The price fixed for the stock, which was divided into units of five shares of Class B stock and one share of Class A stock, was thirty-four dollars and fifty cents per unit. This is the basis upon which Mrs. Patterson transferred her first 600 shares to the General Industrial Foundation. It is important to note that although the par value of a unit of the stock was thirty dollars, the stock was being sold to Mrs. Patterson for thirty-four dollars and fifty cents per unit, or four dollars and fifty cents above the par value. The price fixed as above set forth was clearly arbitrary and not based on any real value.

The People contend that the defendants represented to the complainant that their company was a " going concern;" that it was able to conduct and was conducting a business, even if she had not come to its assistance; that the defendants led her to believe that there were other funds in the company; that at the time the complainant transferred her Curtis Company stock and for a long time thereafter she had no idea that it was her money that was carrying on the business, buying furniture, paying the rent and large salaries to these defendants; that she did not know and was not informed that she had contributed the only real capital of the concern.

In this connection it is interesting to note the salaries that were voted by the General Industrial Foundation to its various employees; Alpaugh, $500 a month; Barnes, $750 a month; Suffern, $750 a month. Dyche received $75 per week. These were voted July 3, effective as of June 1, 1930.

The General Industrial Foundation disposed of Mrs. Patterson's stock and received in cash therefor the sum of $470,000. It speculated in stock transactions and lost money, except in one instance where it made a profit of $21,000 by trading in wheat futures.

The appellants contend that the complainant knew the workings of the General Industrial Foundation; realized that it was in the formative stage; that she knew that the principal alleged asset of the company was worth the amount that she paid and that no misrepresentations as to the company being a " going concern " were made to her.

The appellants attack the indictment, contending that it does not charge any crime, because in alleging a conspiracy to cheat and defraud, the *means* which it sets out are insufficient, it not being sufficient to constitute the obtaining of money or property by false pretenses, or means which, if executed, amount to a cheat or that the means in themselves are criminal.

We must not overlook the fact that this indictment is for a conspiracy to cheat and it is not for larceny by false pretenses or false representations. Those were the means used. The fact that there are items of misrepresentation specified therein is of no great moment and even if it be considered necessary to set forth particular overt acts of misrepresentation, that has been done and the overt acts have been proved.

In the case of *People* v. *Tavormina* (257 N. Y. 84) the court said that even though an indictment alleged overt acts which would constitute a felony, a defendant has no complaint if he is tried for a misdemeanor for committing those acts.

In *People* v. *Peckens* (153 N. Y. 576, 591) such an indictment was held good. There the court said: " It is insisted that many of the representations to the complainant and her husband, which induced the making and delivery of her deed, were expressions of opinion, and although false and known to be so, no liability resulted. * * * But, where the statements are as to value or quality, and are made by a person knowing them to be untrue, with an intent to deceive and mislead the one to whom they are made, and he is thus induced to forbear making inquiries, which he otherwise would, they may amount to an affirmation of fact rendering him liable therefor."

The evidence clearly shows that in this case there was a deliberate attempt to cheat this woman. She was induced to part with her money upon absolutely false representations. If there is any doubt about this, the testimony of Barnes, who pleaded guilty and became a witness for the People, is conclusive on that point. He showed that a well-planned conspiracy had been entered into to induce this complainant to part with her stock.

The indictment alleged that it was represented that certain shares of stock of a corporation were of equal value to those in the possession of Mrs. Patterson; that the defendants represented and pretended to Mrs. Patterson that the stock of the General Industrial Foundation, consisting of 2,000 shares of one variety, and 10,000 of another, was of the same value as 600 shares of the Curtis Publishing Company stock. To accomplish that result the conspirators grouped the General Industrial Foundation stock in so-called units, arbitrarily fixing the price of thirty-four dollars and fifty cents for a unit thereof. Having fixed a general value for the stock, they transferred some of it at that price to Mrs. Patterson for her Curtis stock.

The appellants contend that no false representations as to the value of the General Industrial Foundation stock had been made to Mrs. Patterson. If their contention is that no specific statements were made that a unit of that stock could be sold on the open market at the price fixed by them, that contention would be correct. However, the actual exchange of stock at a fixed price is certainly more than an expression of opinion on their part. This transfer was in effect, by virtue of the circumstances herein, a statement of fact on their part that the one stock was equal in value to the other stock.

It is clear from an examination of the record that the conspirators concealed from Mrs. Patterson matters which were peculiarly within their knowledge. They may have been of the opinion that they were too clever to make definite representations, but their acts were representations.

In *United States* v. *Brown* (5 F. Supp. 81, 88, decided Nov. 23, 1933) the United States District Court, Southern District of New York, cited the dissenting opinion of Judge MILLER in *Ottinger* v. *Bennett* (144 App. Div. 525), upon which the Court of Appeals (in 203 N. Y. 554) reversed, and said that the test of fair dealing is the one to be applied in determining whether the scheme set forth in the indictment is fraudulent. In the opinion of Judge MILLER we find the law well stated as follows: " It is familiar law that a fraudulent representation may be effected by conduct, by acts as well as by words, by silence when there is a duty to speak, by half-truths calculated to mislead, or by reckless statements made without knowledge."

We have, therefore, a misrepresentation alleged in the indictment. We have an indictment which is good without a specific representation. Assuming that there was no representation charged in the indictment, all that was necessary was to prove the fraud by acts, conduct or even by silence when there was a duty to speak or by

half-truths calculated to mislead or by reckless statements made without knowledge of the true facts.

The record abounds with testimony showing that these defendants conspired to defraud Mrs. Patterson. If any doubt is in the mind of any one, a few excerpts from the testimony of the witness Barnes will suffice to remove that doubt.

The witness Barnes testified: " Q. And your recollection now is clear that you told Mrs. Patterson that the stock would be held and was not to be sold? A. Yes, that is clear."

On re-cross he gave the following testimony: " The Court: What liquid assets did this company ever have? You say they became less and less liquid. The Witness: I would say that originally the Curtis stock and the resultants from that Curtis stock. The Court: Apart from the Curtis stock furnished by Mrs. Patterson, did the company ever have any liquid assets? The Witness: According to my opinion, I would say that was the only source of liquid assets."

Barnes further testified: " Q. So that at this first talk, you did not misrepresent anything to Mrs. Patterson, did you? A. I did not say anything about that mine. Possibly I should have. Q. First — we will come to the mine. You didn't misrepresent anything to Mrs. Patterson, did you? A. Unless omission is misrepresentation. * * * I feel that the whole situation resulted in effect in defrauding Mrs. Patterson."

It must also be borne in mind that these defendants induced this woman to believe that while title to the stock passed, the stock would not be sold, and the evidence shows that it was at all times their intention to sell and dispose of the stock.

The testimony shows a clear intent to cheat. The indictment alleges a conspiracy to cheat and the overt acts used in cheating were proved, warranting a conviction which should be affirmed.

O'MALLEY, TOWNLEY and GLENNON, JJ., concur; FINCH, P. J., dissents and votes to reverse and dismiss the indictments.

FINCH, P. J. (dissenting). This record contains no evidence upon which to rest a finding of conspiracy.

Previous to the incorporation of General Industrial Foundation, Dyche, White and Barnes had sought without success to interest Mrs. Patterson in the mine which was later taken over by General Industrial Foundation. Barnes was employed as salesman to secure subscriptions to the stock of the foundation in order to finance its activities. Barnes succeeded in interesting Mrs. Patterson in the

stock of this corporation. He was of course anxious personally to succeed in so doing, and he admits he improperly withheld knowledge from Mrs. Patterson that the chief asset which the foundation then possessed was the gold mine in which Mrs. Patterson recently had declined to be interested. There is absolutely no evidence, however, of any knowledge on the part of the other defendants that such knowledge was withheld much less any agreement among the defendants that misrepresentations either affirmative or negative, should be employed for the purpose of securing the financial aid of Mrs. Patterson. Upon the contrary, the defendant Barnes, who confessed to being personally guilty and testified on behalf of the People to the fact that he concealed from Mrs. Patterson information that the Royal mine was the chief asset of foundation, expressly and specifically denied that there was any agreement among the defendants to defraud Mrs. Patterson. There is thus lacking not only any direct evidence of the gravamen of the crime of conspiracy to defraud, namely, the fact of a combination (*People* v. *Suffolk Contracting Co.*, 171 App. Div. 645), but there is direct evidence to the contrary. It is not a case, therefore, where the conclusion of a corrupt agreement of conspiracy may be deduced from circumstantial evidence alone, since the inference of guilt of conspiracy does not exclude to a moral certainty the hypothesis of innocence. In other words, in view of the testimony of the People's witness Barnes that there was no conspiracy, it is at least equally consistent with the hypothesis that the defendants conspired that only the defendant Barnes, in his personal desire to earn a commission and further his position with the corporation, deceived the complainant. Under such circumstances, a conviction of conspiracy to defraud cannot be sustained within the rule stated in *People* v. *Razezicz*, (206 N. Y. 249, 273), as follows: " In a criminal case circumstantial evidence to justify the inference of guilt must exclude to a moral certainty every other reasonable hypothesis. Circumstantial evidence in a criminal case is of no value if the circumstances are consistent with either the hypothesis of innocence or the hypothesis of guilt; nor is it enough that the hypothesis of guilt will account for all the facts proven. Much less does it afford a just ground for conviction that unless a verdict of guilty is returned, the evidence in the case will leave the crime shrouded in mystery."

In the case at bar the defendants, naturally, were interested in obtaining funds for the operations of the foundation. From that fact, however, does not flow exclusively the inference that they conspired to achieve that end fraudulently. Upon the contrary, it appears that the defendant Suffern long before knowing of Mrs. Patterson had projected the incorporation of the General Industrial

Foundation, to be used as a medium for the organization of a group of distinguished and outstanding engineers and industrialists to be associated in working along engineering, mining and financial lines for the purpose of acting in a consulting and advisory capacity and also acquiring interests in such projects; and Barnes and he had attempted to interest people therein before either of them knew of Mrs. Patterson and before the incorporation of said foundation. The initial financing secured from Mrs. Patterson was expended upon a large number of engineering, mining and industrial projects, certain of which promised to be successful at the time this prosecution was instituted. There had also become associated with said foundation many leading industrial, mining and electrical engineers and experts. The defendants did not divert the money received, but appear in good faith to have used it for the purposes of the foundation. Moreover, the great weight of the evidence shows that the complainant was fully cognizant of the affairs of the General Industrial Foundation and of its interests in the Royal Gold Mine, and approved of its affairs following the delivery by her of the 600 shares of stock and up to the time that she lost confidence in the success of the enterprise. Assuming that the stock of the complainant was sold in violation of a parol agreement not to sell the same, these defendants, appellants, would then be liable for breach of contract; but this is a very different thing from sustaining an indictment charging a conspiracy to cheat and defraud the complainant out of her stock by specific false representations, none of which are shown to have been made.

In addition, the court erred in a material matter when it instructed the jury that the complainant and the defendants had entered into an agreement of exchange of stock and that from such agreement a term might be implied which presupposed a representation that the value of the two stocks was equal. In the first place, this agreement did not provide for an exchange of ownership of the two stocks, but showed upon its face that all the parties contemplated was a loan of collateral for the purpose of raising funds in order that the General Industrial Foundation might be in corporate funds until such time as it had created a market for its own stock and thereby might, with the funds so obtained from the sale of its own stock, repay loans to be obtained upon the collateral of the complainant. In addition and more important, there was no representation or even an agreement of equality between the two stocks. It is obvious that, even if there had been an exchange of ownership between the two stocks, no representation as to parity of values is thereby to be implied.

The court having dismissed the representation that a new Hotel Belmont was to be constructed, and there being no evidence of any representation, either express or implied, concerning the parity of values in the so-called exchange agreement, and no evidence of conspiracy, it follows that the judgment appealed from should be reversed and the indictments dismissed.

Judgment affirmed.