The People of the State of New York, Respondent, *v.* David Lewis, Appellant.

Third Department, January 8, 1936.

*Lewis E. Mosher,* for the appellant.

*Sheldon F. Roe, District Attorney,* for the respondent.

RHODES, J. The indictment herein charges in four separate counts that on or about the 12th day of May, 1935, the defendant criminally received, bought, concealed and withheld, and aided in concealing and withholding 1,747 pairs of shoes of the value of $3,000, knowing the same to have been stolen, and intending to deprive the owner therein named of its property.

At the close of the evidence the second count which charged defendant with criminally buying said property was stricken out, on the ground that any purchase occurred outside of Chemung county, and upon the remaining counts the jury returned a verdict of guilty, as charged.

On the 12th day of May, 1935, the chief of police of Elmira, N. Y., received a telegram from a police inspector of the city of New York, which stated: " Have arrested for Grand Larceny two men driving truck containing shoes stolen property. Ninety-two cases of shoes were delivered to Dave Lewis, 110 Washington Street, your city, May 11. Investigate and ascertain from whom he received these shoes. Hold Dave Lewis and property if he cannot show proper credentials."

About ten o'clock that evening a police detective and another police officer went to the defendant's residence and waited for the defendant, who was absent from home, and did not arrive until about midnight. When he appeared he was interrogated by the police officials about the shoes referred to, and he told them that a quantity of shoes which were in his cellar had arrived by truck while he was in New York; that he did not know anything about the shoes and had not bought them; that he had talked with a man named Ronowitz or Aronowitz, in New York, relative to the purchase of some shoes; that before purchasing he was to be notified so that he could see the shoes or samples before buying. When told that it was claimed that the shoes had been stolen, he made no objection to their being removed by the police, and they were removed by the police, in the police patrol, and thereafter were in police custody until the trial.

The defendant at that time claimed that, according to what he had learned from his family, the truckmen had refused to take the shoes to another place where the defendant's daughter had requested that they be taken and unloaded, but insisted on leaving them at

his residence, and had unloaded them and placed them in his cellar. He produced a paper which he said had been left with the shoes. This paper was in the following form:

" Telephone TOmpkins Square 6-5800
Bishko Trading Co.
General Merchandise
16 East 23rd Street, New York, N. Y.

May 9, 1935

Sold to Lewis & Stemmerman
110 Washington St., Elmira, N. Y.

Terms————————
76 cases—24 prs Mens      53 Cases—12 prs ass'td
Cons————"

This was the only paper he produced at the time. He told the police that he was going into business in a vacant store next to Shriebman's jewelry store on Water street, in Elmira, N. Y. The owner of the vacant store testified that she had never been approached by any one seeking to rent it in behalf of defendant, and her agent testified to the same effect. Another real estate agent, however, testified that the defendant had previously interviewed him and requested that he investigate as to whether or not the store was available for rent and occupancy.

At the trial the defendant disputed the story of the witnesses for the People in essential details. The story of himself and his witnesses was to the effect that he had previously been in the men's furnishing and shoe business, and in other activities until about 1925 or 1926; that thereafter he worked as an employee for one Max Kinner until about 1933, and that thereafter, he had been out of business, living on the rents and income of his properties, which were in his wife's name.

The testimony in his behalf further indicated that he had resolved to engage in the men's furnishing and shoe business again and for this purpose had gone to New York to look over the market, stocks of goods which were being sold at auction, and investigate prices; that he had previously done business with Ronowitz, and found him all right; that Ronowitz claimed to own the stock of shoes which he had bought at auction, consisting of a good grade of seconds.

Defendant testified that Ronowitz showed him a bill showing the price which he had paid for the shoes, but did not want to show him the name of the man from whom he bought them, as he did not want to disclose the places where he purchased because he was not making enough, the inference being that he did not want to disclose favorable trade secrets to possible competitors.

Defendant says that he inspected, and bought at one dollar a pair, the whole lot, consisting of 2,400 pairs; that before purchasing he made inquiries of various people, and was informed that Ronowitz was all right; that when the shoes arrived in Elmira he examined them and found that they were not what he had bought; that there were many shoes bearing the Montgomery Ward trade-mark, and that he had seen no such shoes at the time he purchased them in New York.

Defendant produced on the trial the receipt or invoice which he claims was furnished him by Ronowitz at the time he purchased the shoes. It is in the following form:

> " Phone CHelsea 3-6663          May 9, 1935
> S. RONOWITZ & Co.
> Jobbers of Clothing — Shoes — Auction Goods
> 1123 Broadway
> New York City, N. Y.
> Terms — Cash          Shipped via Truck
> Lewis & Stemmerman
> Elmira, N. Y.
> 2400 pr. Shoes — Job Lot — as is 1.00 2400.00
> Paid
> May 9, 1935
> Per SAM RONOWITZ "

The defendant says that the Stemmerman referred to in the name Lewis & Stemmerman was defendant's partner. The place in New York where the defendant saw the shoes was simply a storage room containing only the shoes in question, having no store equipment or clerks, and was far removed from the shoe district.

At the time of the trial Ronowitz was not produced as a witness. Both sides claimed that they were unable to locate him.

On the evening when the police were at his house he was told to visit the chief of police the next morning. He did not do so, but says that he phoned his attorney, and then went to New York to see Ronowitz in an endeavor to get back his money, but that he did not obtain satisfaction from Ronowitz. He then went to Buffalo to interview an attorney, and a few days later returned home. The police detective testified that on the night when the shoes were taken by the police he had no warrant for his arrest, did not arrest the defendant, did not feel that he had facts enough to warrant his arrest and saw no evidence of any crime that the defendant had committed.

The shoes in question had been manufactured by Daly Bros., Inc., a shoe manufacturing corporation having a factory at Belfast, Me. On March 29, 1935, a truck loaded with shoes was shipped

from this factory *en route* to Boston, and on the way the driver of the truck was robbed of the truck and the shipment. The shoes were packed in paper cartons, some of the cartons containing twelve pairs and some containing twenty-four pairs. The shipping clerk at the factory in Belfast had marked each carton with a pencil notation, and at the trial identified twenty-two of these cartons from such markings. When the cartons were shipped they had stickers placed upon them, and the cartons which were produced in court had no such stickers, but on each carton was a place showing where the sticker had been removed. None of the cartons could be identified as having come from the factory except those which bore the pencil marks of the shipping clerk, and no witness was able to identify any of the shoes which were in court as having been a part of the shipment which was stolen. The cartons bore the name of a concern which manufactured cartons and were of the kind purchased by Daly Bros., Inc., from such manufacturer.

The foregoing is an outline of most of the salient facts. The record is too voluminous and the details are too numerous to permit of their enumeration here.

The defendant's counsel asserts that several errors in rulings as to the admission of evidence and error in the charge and prejudicial statements in the summation of the district attorney, require a reversal. These are not discussed, however, for the reason that a more fundamental reason exists which requires a reversal of the judgment and dismissal of the indictment.

There was no direct evidence that the defendant knew that the shoes in question were stolen. The testimony in his behalf in many instances is at variance with the evidence produced on behalf of the People, and the jury rejected his version; but although the jury may not have believed his testimony and may have concluded that he committed deliberate perjury, this did not suffice to establish affirmatively that the defendant knew that the shoes were stolen. If the testimony of the defendant and his witnesses is not to be believed, we are still required to weigh the evidence favorable to the People to determine if thereby it has been established beyond a reasonable doubt that the defendant knew that the shoes were stolen property. (Code Crim. Proc. § 389.)

There being no direct evidence of the defendant's guilty knowledge, it must be established, if at all, by circumstantial evidence. Practical experience admonishes us that direct evidence of guilty knowledge is rarely available. This difficulty, however, furnishes no justification for substituting suspicion and conjecture for requisite proof.

The language of the court in *People* v. *Razezicz* (206 N. Y. 249) is peculiarly applicable here. There the court said (p. 271): " The mass of testimony presented to the jury includes very many facts that are consistent with the defendant's guilt. They arouse one's curiosity and suspicion, but do not convince the judgment."

The court further said (p. 272): " Circumstantial evidence, as has been frequently remarked, is unsatisfactory, inconclusive and dangerous, or satisfactory, conclusive and safe, according as ·it points to a certain result and is not inconsistent with any other result or conclusion."

In *People* v. *Bennett* (49 N. Y. 137) it was said: " In determining a question of fact from circumstantial evidence, there are two general rules to be observed: 1. The hypothesis of delinquency or guilt should flow naturally from the facts proved, and be consistent with them all. 2. The evidence must be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him, or in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence." (See, also, *People* v. *Kennedy*, 32 N. Y. 141; *People* v. *Fitzgerald*, 156 id. 253; *People* v. *Giordano*, 213 id. 575; *People* v. *Harris*, 136 id. 423; *People* v. *Place*, 157 id. 584.)

The circumstances surrounding the transaction, together with defendant's conduct, may have been such as to arouse suspicion, and the falsehoods which he told undoubtedly proved disastrous, but motives other than guilt may have prompted him to distort the truth. At least six police officers were present with the police patrol, at his residence, when he was first interviewed, a crowd had collected and there were newspaper reporters present taking flash-light pictures and making inquiries. The defendant's wife fainted, and he was undoubtedly excited and upset. It may be that an innocent man impelled by moral cowardice and fear would have concealed the truth or falsified.

Upon the whole record, it cannot be said that the inference of guilt is the only one which can reasonably be drawn from the facts presented. The People have, therefore, failed to produce sufficient proof of the guilt of the defendant to support a conviction under the existing rules of law, and the judgment should be reversed and the indictment dismissed.

McNAMEE, BLISS and HEFFERNAN, JJ., concur; HILL, P. J., votes for reversal and for a new trial, with a memorandum.

HILL, P. J. A large quantity of shoes that had been stolen shortly before was found in the cellar of defendant's residence. His explanation of the purchase and the unusual place of storage was not so

clear and convincing as to require a dismissal of the indictment. The question of defendant's guilt should be determined by a jury.

The exclusion of evidence by a bank official offered on behalf of the defendant to show that his acts in connection with the purchase of the shoes were not secret, was prejudicial. The theory of the People was that defendant's conduct in this transaction indicated a desire for secrecy. Evidence to the effect that prior to the purchase of the shoes, when defendant had no reason to falsify, his daughter at his direction procured a draft from a bank, she stating that the money was to be used to pay for shoes which defendant was about to purchase in New York, was admissible. (*Ferris* v. *Sterling*, 214 N. Y. 249, 253, 254; *People* v. *Katz*, 209 id. 311, 336, 337.)

I favor a reversal and a new trial.

Judgment of conviction reversed on the law, and indictment dismissed.