# COURT OF GENERAL SESSIONS — NEW YORK.

## May, 1919.

## THE PEOPLE v. WILLIAM F. DOYLE, LEON C. WALLACE, FRANK McGOEY and FRANK H. McGINNISS.

### (107 Misc. Rep. 268.)

INDICTMENTS*—EVIDENCE BEFORE GRAND JURY—CONSPIRACY—ACCOMPLICE—CORROBORATION—WITNESS—CRIMINAL LAW—GREATER NEW YORK CHARTER, LAWS 1901, CHAP. 466, AS AMENDED—PENAL LAW, § 1826.

The defendant A, chief of the bureau of fire prevention of the fire department of the city of New York, vested with authority to perform the duties and powers devolved upon the fire commissioner by the city charter (Laws of 1901, chap. 466, as amended), and by certain of the city ordinances, and the defendant B, a captain in another department of the bureau of fire prevention, which was under the supervision of A, were charged by indictment with conspiracy to suppress and prevent the prosecution and punishment of certain divers persons for the violation of certain statutes and city ordinances, and it was also charged that A and B, together with the defendants C and D, civilians, formed an organization known as the "Columbus Film Exchange" for the purpose of collecting money illegally from persons engaged in the moving picture business. An indictment under section 1826 of the Penal Law charging that A feloniously asked and received from and agreed and consented with divers persons to receive certain money, gratuity and reward, which he was not entitled to receive, for the purpose of omitting to perform and for having omitted to perform official acts which related to the duties and powers of his office, in that he omitted to detect and cause to be detected violations of statutes and ordinances, and for omitting to prosecute and cause to be prosecuted violators of said statutes, although it was his duty so to do, further charged that B, C and D feloniously aided and abetted A in the commission of the crime. Another indictment charged that B had violated said section 1826 and that he was aided and abetted by the other three defendants in the commission of the crime. D, the only defendant who did not move for an

* See notes, Vol. 6, p. 374; Vol. 10, p. 558; Vol. 14, p. 174; Vol. 22, p. 454; Vol. 29, p. 238.

inspection of the minutes of the grand jury, upon which all of the indictments were found, waived immunity and testified against his co-defendants. There was no evidence as to whether A received any money from D or any other person and the record is silent as to what disposition C made of money paid to him by D. Separate motions by the defendants other than D to dismiss the indictments, made after inspection of the minutes of the grand jury, considered, and the motion of A to set aside the three indictments granted, with leave for a resubmission of the charges to the same or another grand jury, provided the district attorney can obtain legal evidence to connect A with the crimes charged.

No legal evidence having been presented showing that B and C aided and abetted A, their motion to dismiss the indictment charging A with a violation of section 1826 of the Penal Law is granted with leave for a resubmission of the charges as against them to the same or another grand jury, etc.

The motions of B and C to dismiss indictments charging them with the crime of conspiracy and the indictment charging B with a violation of section 1826 of the Penal Law, denied.

Where the district attorney called as a witness to corroborate the testimony of D his wife, and it clearly appears that she had guilty knowledge of the criminal purpose of the film exchange, knew that her husband collected money from the exhibitors, which was to be paid to public officials for violating their duty, was present on several occasions when the ill-gotten gains collected by her husband were turned over to C, agreed to act as the depositary of her husband's share thereof, that a sum of money received from him was the result of his share of the tribute paid by the exhibitors, and was paid to her during the conspiracy, she must be held to have been an accomplice, as matter of law.

Evidence of witnesses other than D and his wife by which it was sought to corroborate their testimony considered, and *held*, that it did not tend to show that A was connected with the crimes charged in the indictments against him but that there was sufficient corroborative proof of a circumstantial and direct character to support the testimony of the accomplices, and to connect the defendants B and C with the transactions set forth in the indictment.

MOTIONS to dismiss indictments.

*Edward Swann, District Attorney (Albert B. Unger, Deputy Assistant District Attorney)*, for People.

*Abraham Levy,* for defendant Doyle.

*House, Grossman & Vorhaus,* for defendant McGoey.

*Olcott, Bonynge, McManus & Ernst,* for defendant Mc-Ginniss.

ROSALSKY, J.:

The grand jury of this county returned three indictments against the defendants. In one they are charged with the crime of conspiracy. In the other two, defendants Doyle and Mc-Ginniss, respectively, are charged with the violation of section 1826 of the Penal Law, and the other defendants are alleged to have aided and abetted them in the commission of the crimes.

The indictment charging the defendants with conspiracy alleges that they unlawfully and corruptly conspired together, each with the other, to commit an act for the perversion and obstruction of justice and of the due administration of the laws, in that they and each of them agreed and conspired together to suppress and prevent the lawful prosecution and punishment of divers persons for the violation of certain existing statutes and ordinances of the city of New York.

One of the indictments under section 1826 of the Penal Law alleges that the defendant William F. Doyle, a public officer, feloniously asked and received from and agreed and consented with divers persons to receive certain money, gratuity and reward, which he was not entitled to receive, for the purpose of omitting to perform and for having omitted to perform official acts which related to the duties and powers of his office, in that he omitted to detect and cause to be detected violations of statutes and ordinances, and for omitting to prosecute and cause to be prosecuted violators of said statutes and ordinances, although it was his duty to do so.

This indictment further alleges that the other defendants, Frank H. McGinniss, Frank McGoey and Leon C. Wallace, feloniously aided and abetted the said Doyle in the commission of the crime.

The other indictment under section 1826 of the Penal Law is similar in form to the Doyle indictment, except that the public officer who is alleged to have violated this statute is the defendant Frank H. McGinniss, and that he was aided and abetted by the other three defendants in the commission of the crime.

The defendants, with the exception of Leon C. Wallace, moved for an inspection of the minutes of the grand jury, on which the indictments were found. That motion was granted and they now severally move through separate counsel to dismiss the indictments upon the following grounds:

1. That there was no evidence before the grand jury other than the uncorroborated testimony of accomplices in the alleged crimes; and,

2. That the indictments were found without evidence or upon illegal and incompetent testimony in violation of the constitutional rights of the defendants.

The record of this case consists of 305 pages. In view of the contentions made by the counsel representing the defendants, their interests must be separately considered. It is, therefore, difficult to resort to economy of space as a proper understanding of the questions raised as to the validity of the indictments requires a comprehensive statement of the important facts as disclosed by witnesses in their testimony before the grand jury.

During the times mentioned in the indictments, the defendant Doyle was chief of the bureau of fire prevention of the fire department of the city of New York, vested by law with the authority to perform the duties and powers devolved upon the fire commissioner by chapter 466 of the Laws of 1901, as amended, and by certain ordinances of the city of New York.

The defendant McGinniss was a captain in the bureau of public assembly, a department included in the bureau of fire prevention, and which was under the supervision of the defendant Doyle.

The activities of the bureau of fire prevention were confined to the inspection of buildings with a view to ascertaining whether they complied with the city ordinances in relation to structural arrangements, fire appliances, etc.

The bureau of fire prevention had jurisdiction over moving picture theatres, theatres, dance halls and other places of public assembly. It was the duty of the head of this bureau to enforce the observance of the fire laws in the above-mentioned places of entertainment in relation to exits and fire appliances; to prohibit the blocking of aisles, and to prevent the patrons from standing in the aisles or passages of moving picture theatres, etc. There was a staff of several firemen attached to this bureau and they were required to inspect the motion picture theatres and to report to the defendant McGinniss any violations of the fire laws.

In the event of a violation of any of the fire ordinances by a moving picture theatre a violation would be lodged against such theatre and forwarded to the defendant Doyle with an indorsement on the back thereof, signed by the defendant McGinniss, reading as follows: " Respectfully referred to the Chief of the Bureau of Fire Prevention with the recommendation that the within violation be forwarded to the Corporation Counsel for the collection of penalty."

It was then the duty of the defendant Doyle to transmit the violation to the corporation counsel for action.

The People charge that Doyle and McGinniss, public officers, together with McGoey and Wallace, civilians, formed an organization known as the Columbus Film Exchange for the purpose of collecting graft from persons engaged in the moving picture business.

The co-defendant, Wallace, waived immunity, became a witness for the State, and testified before the grand jury against the other co-defendants. His testimony substantially purports to narrate the entire transactions had among them.

He testified that he was the manager of Healy's restaurant, located at Columbus avenue and Sixty-sixth street, Manhattan; that one evening in November, 1918, he dined with Doyle and McGoey at this restaurant, and that the following took place: "Dr. Doyle sat down and Mr. Frank McGoey was present. After talking a little while on different subjects, he made the remark that I ought to get into some other kind of business; that he didn't think it was any business for a white man to be in, and he asked me how I would like to go into the moving picture business, and I told him I would if I saw any prospects in it, and he said, 'Well, we have an idea that we want to open up an exchange to rent films to moving picture houses of New York City and Brooklyn.' And he said, 'If you will take charge of it and take care of the details, we will take care of the rest of it.' He said if I got into the business when it became known that some one in the Fire Department was interested in the Exchange, that they would be all only too glad to come down and to do business with me."

Thereafter Wallace had several conversations with McGoey at his house, meeting him almost nightly, at which the business plans of the film exchange were discussed. He told Wallace to rent an office, to purchase furniture, and that as soon as the business would be established he would purchase the films.

In the course of the conversations had between McGoey and Wallace, McGoey said that the money realized in the business was "to go six ways," one-sixth to himself, one-sixth to Doyle, one-sixth to McGinniss, one-sixth to Chief Kenlon, one-sixth to Commissioner Drennan, and the remaining sixth to Wallace.

At this stage of the discussion it should be said in justice to Fire Commissioner Drennan and Chief Kenlon that the district attorney and counsel representing the defendants agree that these officials were not directly or indirectly connected with this enterprise, and I find absolutely nothing in the record which in any way reflects on them. The fact is that when

the fire commissioner heard rumors as to the nature of the business of the Columbus Film Exchange, he instituted an investigation and brought the matter to the attention of the district attorney.

In the latter part of November, or the early part of December, 1918, the defendant McGinniss was introduced to the defendant Wallace by McGoey at Healy's Ninety-fifth street restaurant. Wallace had never met McGinniss prior to that time. McGoey told him that McGinniss was the man who was going to be associated in the exchange, and that he would solicit the customers for the Columbus Film Exchange, and McGinniss replied that he would do so just as soon as Wallace would start the business.

In the early part of January, 1919, the defendants Doyle and McGoey lunched at Healy's restaurant. On this occasion the defendant Wallace stated that Doyle expressed his impatience at Wallace's failure to start the business and said: "We can't wait; get busy on it; get busy and open up. We are losing a lot of time and money here." Doyle also said that this business had to yield about $50,000 or $60,000.

After this meeting, Wallace opened the exchange at 144 Columbus avenue, Manhattan, and employed one Florence McGrath as stenographer, who was formerly employed as a telephone operator at Healy's restaurant.

Thereafter McGinniss delivered to Wallace two lists containing the names and addresses of the motion picture theatres, and the amounts which the proprietors thereof were to pay monthly for renting films. These lists were typewritten by the stenographer and the originals were destroyed by Wallace.

McGinniss told Wallace that the amount to be charged to a motion picture house was regulated according to its seating capacity. A motion picture theatre with a seating capacity of 300 was to pay ten dollars; 400, fifteen dollars; 500, twenty dollars, and 600, twenty-five dollars.

After McGinniss furnished the lists to Wallace, the Columbus Film Exchange was ready to conduct business. It appears from the record that about fourteen representatives of various moving picture theatres visited the office of the exchange and paid money either to the defendant Wallace or to the stenographer in his absence for which receipts were furnished to them.

Although the Columbus Film Exchange had been in existence for about one month and actively engaged in receiving money from the moving picture exhibitors, ostensibly for film service, it never made any real effort to supply such service. In fact, it was in no position to do so, for it never had a stock of more than seventy-five dollars worth of film.

According to the testimony of the exhibitors, it is manifest that their true purpose in doing business with the exchange was not to receive film service, but to secure immunity for the violation of the fire laws, in permitting " standees " at their theatres. Nearly every one of the exhibitors testified that in paying money to the exchange he expected " protection " and favors from the fire department.

The defendant Wallace collected from the representatives of the motion picture theatres in January and February about $1,800 or $1,900, which he paid to McGoey, after deducting certain items of expense consisting of the following: Three weeks' salary to the stenographer amounting to $60; office rent, $37.50; renting of typewriting machine, $4, and a payment of $75 to McGinniss for film.

McGoey gave Wallace $169 as his share, and also gave him $160, which he requested him to pay to McGinniss. Wallace claims that he did so either on the third or fourth of February.

There is no evidence as to whether Doyle received any money from Wallace, McGoey or any other person, and the record is also silent as to what disposition McGoey made of the money which was paid to him by the defendant Wallace.

Sometime in February, 1919, McGoey told the defendant

Wallace that the exhibitors had complained to the fire commissioner to the effect that " they were held up by McGinniss, or some one connected with the fire department," and he suggested to the defendant Wallace that he should close the business, which he did. Later Wallace was summoned by the district attorney and laid bare the alleged acts of the other defendants.

The district attorney realizing that the defendant Wallace was an accomplice as a matter of law, and appreciating that section 395 of the Code of Criminal Procedure in its humane policy intends that the liberty of an accused person shall not be sworn away by an accomplice, unless he be so corroborated as to some material fact or facts as to give his testimony a probative value, called his wife as a witness.

The defendants strongly insist that Mrs. Wallace's testimony cannot be regarded as legal corroboration of her husband's story on the ground that she is also an accomplice as a matter of law.

In view of this contention it becomes important to refer to the main features of her testimony in order to determine her status in connection with the crimes alleged to have been committed by the defendants.

Mrs. Wallace was aware that her husband was connected with the Columbus Film Exchange from its inception, because she was present at nearly all of the conferences held by her husband and the other defendants.

In October or November, 1918, she was present when McGoey met her husband and discussed the scheme. McGoey explained to them the nature and character of the business, and he told them that the other persons to be interested in the exchange were Fire Commissioner Drennan, Chief Kenlon, the defendants Doyle and McGinniss. It appears from her testimony that McGoey was the first of the defendants who brought the film business to their attention.

When questioned by the district attorney as to whether she knew that the business in which her husband had an interest

was a mere cloak for the collection of protection money, which was to be divided among public officers, McGoey and her husband, she testified as follows: " Q. Before you give the names did he tell you what the exact nature of the business was; did he say anything that conveyed to your mind that this wasn't a real film or moving picture business? A. He said they were coming down and pay, these houses; it was only small houses would come down, the proprietors of them and they were to pay so much money each house and get a film, *but he said he knew they didn't care whether they got film or not, it wasn't the film they were coming down for.* Q. Did he say what they were coming down for, according to his plan? A. The people in the fire department were the others that were in it. Q. Were going to do what; did he say what they were going to do for these moving picture people, or what they were expected to pay for? A. For films. Q. Tell us what you heard McGoey say about the business. A. He said these people would come down and pay this money and that there would not be any discussion of any kind about what they were doing, that they had their instructions to come down there and see Mr. Wallace. That was the conversation. They were to ask for Mr. Wallace and pay him this money. Q. Did you have another talk with McGoey and Mr. Wallace and any other person about this thing? A. Yes, sir; I did. I was at lunch one day and Mr. Doyle and McGoey came in and discussed this same business venture, and they spoke about what it would mean to each one, and Mr. Doyle turned to me and said, ' *You don't want to make any display of this money. You don't want to buy an automobile or invest in any diamonds or jewelry. You want to live on your regular income in the way you have been living* ' and he said he had been broke and wanted to know if we knew what it was to be broke, and he advised Mr. Wallace right before me, we were all present: McGoey, Wallace and Doyle and Mrs. McGoey, that any money he got to give me, to put in my name.

Q. What did McGoey say to your husband, in your hearing, about opening this business? A. That they were going in on it and open it up and these moving picture men were coming down and pay so much for each house for films. They were supposed to pay for films, *and that it would amount to so much to us,* that it would be ten or twenty thousand a year to each one in it. Q. And he said that would net you or Mr. Wallace — A. It would mean so much to us a year, might be ten or twenty thousand a year. Q. Did Mr. Wallace ever give you any money in addition to the usual allowance he made you? A. Just once. Q. How much did he give you then? A. I think about $150 or $160. Q. Did he tell you when he gave it to you where it came from? A. Yes, sir. I understood that. He told me that was his share, that was his money. Q. His share of what? A. That was one-sixth of the money taken in; that is his expenses. Q. Can you tell us what conversations you had along that line? A. He was always inquiring of Mr. Wallace how much money was received on these dates that I was in there. Q. Did you every hear McGoey ask Mr. Wallace how much money he had received? A. Yes, sir; I did. Q. Did you hear Mr. Wallace tell him various amounts? A. Yes, sir, and he would immediately hand him the money. Q. You have seen Mr. Wallace hand McGoey the money? A. Yes, sir. Q. Did you see what McGoey did with the money? A. He put it in the safe. Q. He (Mr. Wallace) told you he was going there? A. Yes, sir. McGoey told him to come down, *the money would be split that day.* Q. Did you see any large sum of money in your husband's possession prior to the second of February? A. No. Q. Was it before the second of February that you had seen Mr. Wallace give Mr. McGoey some money? A. Oh, yes, it was. Q. Then, as you state it, he was to go there on the second and the division was to be made? A. Yes, sir; at the end of each month, I believe, the division was to be made. Q. How many times did you see your husband give Mr. McGoey money?

32

A. Several times, probably six or seven times. Q. And always in McGoey's house? A. Yes, sir. Q. What other talks were had in your presence about this enterprise after the money had been turned over to McGoey? A. After he had taken up so much time and the office got started he told me it meant so much a year, and one thing I did ask him what all the fuss was about when there was so little done. He said, 'Never mind, don't worry about that. There will be much more. That will come along in time. This thing may amount to one hundred thousand a year.' "

To further detail all the circumstances showing this witness' active participation in the affairs of the Columbus Film Exchange would unnecessarily prolong the discussion. Sufficient circumstances have already been pointed out which clearly indicate to my mind that Mrs. Wallace must be condemned as an accomplice as a matter of law, because she took part both in the preparation for and in the perpetration of the acts charged against the defendants, and that she aided and abetted them to carry out the purpose for which the Columbus Film Exchange was organized.

Her connection with the transaction of the defendants was so palpably criminal that any other conclusion would result in disregarding the rule laid down by the appellate tribunals as to what constitutes an accomplice as a matter of law.

A person is not to be deemed an accomplice merely because he had knowledge of the intended commission of a crime, unless he in some way aids or incites its commission. (People v. McGonegal, 136 N. Y. 62; Bird v. United States, 187 U. S. 118.)

It is also true that one does not become an accessory before the fact by the mere approval of a crime. " Enough must be shown to justify the inference that the offender has counseled or induced or encouraged the crime." (Penal Law, § 2; People v. McGuire, 135 N. Y. 639, 642, 10 N. Y. Crim. 230; People v. Swersky, 216 id. 471, 476, 34 N. Y. Crim. 169.)

What is the test to be applied to determine whether a person is an accomplice? The courts have repeatedly held that: " To constitute an accomplice one must be so connected with a crime that at common law he might himself have been convicted either as the principal or as an accessory before the fact." (People v. Zucker, 20 App. Div. 363, 365, 14 N. Y. Crim. 464, 154 N. Y. 770; People v. Sweeney, 213 id. 37, 46, 13 N. Y. Crim. 232; People v. Bright, 203 N. Y. 73, 79, 26 N. Y. Crim. 277; People v. Swersky, 216 id. 471, 476; People v. Hyde, 156 App. Div. 618, 625, 29 N. Y. Crim. 574.)

The district attorney contends that under the case of People v. Elliott (155 App. Div. 486), if Mrs. Wallace is to be regarded as an accomplice, that question should be left to the determination of the jury on all of the evidence. I am unable to agree with this view.

That case is inapplicable to the facts disclosed in the record before me.

In the Elliott case, a woman named Evelyn Curtis was the mistress of one Chester Errico, who was jointly indicted with Elliott upon a charge of forgery. She denied that prior to the forgery she had any knowledge of the intended crime, or that she participated therein; and she testified that while Elliott was filling out a check, an inkwell upset and she was called by one of the defendants to wipe up the ink, and that at that time she saw Elliott sign the checks, but that she did not know what his purpose was and had nothing to do with it.

She admitted that after the perpetration of the crime she went to Boston and lived with Errico on the proceeds thereof. The district attorney claimed that such facts, after the event, did not make her a principal and an accessory before the fact or an accomplice. He claimed that at best she was an accessory after the fact, and that she could not have been convicted, if indicted herself, for forgery or uttering.

It was, therefore, appropriate upon the facts of that case for

the learned trial judge to decline to charge that the Curtis woman was an accomplice as a matter of law, and that question was properly left for the determination of the jury.

Here we have a different situation. Mrs. Wallace had guilty knowledge of the criminal purpose of the business of the Columbus Film Exchange; she knew that her husband collected graft from the exhibitors which was to be paid to public officials for violating their duty; she was present on several occasions when the ill-gotten gains collected by her husband were turned over to McGoey; she agreed to act as the depositary of her husband's share in a criminal venture; she knew that the $160 which she received from her husband was the result of his share of the tribute paid by the exhibitors, and that this money was paid to her during the existence of the conspiracy.

There can be no doubt that she aided and abetted the defendants in the acts charged against them, because in clear and unambiguous language she said: " They were supposed to pay for films and that it would amount to so much to us; that it would be ten or twenty thousand a year to each one in it."

The district attorney was evidently surprised by this answer. So he put to her a question which he thought would lead her to state that Mr. Wallace was the only member of the family to receive money, but she again reiterated her former statement in giving the following testimony: " Q. And he said it would net you or Mr. Wallace? A. *It would mean so much to us a year;* might be ten or twenty thousand a year."

The Wallaces being clearly accomplices as a matter of law, it was necessary to corroborate their testimony before the grand jury was justified in indicting Doyle, McGinniss and McGoey. (Code Crim. Pro., § 399.)

An indictment should not be found by a grand jury unless " all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." (Code Crim. Pro., § 258.)

If the only testimony before the grand jury consisted of the uncorroborated testimony of accomplices, it cannot be said to be sufficient, if unexplained or uncontradicted, to warrant a conviction by the trial jury.

It is therefore necessary to consider one of the most important questions presented on this motion:

Was there any evidence to corroborate the testimony of the Wallaces to justify the indictments?

The question whether there is any evidence of corroboration of the accomplices is a question of law for the court, but if there is evidence of quality and character fairly tending to prove a defendant's guilt by connecting him with the crime so that the conviction will not rest entirely upon the evidence of the accomplices, then the question whether the evidence is a sufficient corroboration must be determined by the jury. (People v. O'Farrell, 175 N. Y. 323, 326, 17 N. Y. Crim. 409.)

The principal sources of corroboration relied upon by the prosecution to connect the defendant Doyle with the crimes charged against him are:

1. The relations of Doyle and McGoey;

2. The relations of McGinniss and Doyle;

3. The meeting attended by Doyle, McGoey and Wallace;

4. The calling of a meeting of exhibitors by Doyle at which he induced Commissioner Drennan to advise them to cease paying graft to individual firemen. This meeting, according to Wallace, was planned by McGoey and Doyle to attract the attention of the business possibilities of the Columbus Film Exchange;

5. The pigeon-holing of violations against subscribers to the exchange by Doyle;

6. The presentation of misleading reports to the fire commissioner by Doyle;

7. The information given by Doyle, via McGoey, to the de-

fendant Wallace, after an investigation was under way by the fire commissioner; and,

8. The false information given to Commissioner Drennan by Doyle as to his ignorance of the existence of the Columbus Film Exchange at the time that the commissioner began his investigation.

These specific points will be considered in the order in which they have been enumerated.

Points 1 and 2 will be discussed together, as they involve the same question of law.

1 and 2.   McGoey was intimately acquainted with the defendant Doyle.

Commissioner Drennan testified that he saw McGoey in Doyle's office about half a dozen times; that he saw them engaged in conversation on more than one occasion, and that at the sheriff's jury dinner, he sat at the same table with them, but he stated that this meeting at a public dinner might have been without significance.

In 1918, Commissioner Drennan appointed Doyle chief of the bureau of fire prevention.   When he assumed his public duties he found Captain McGinniss, who had been a member of the department for eighteen years, assigned to duty as chief of the bureau of public assembly.   Doyle was his immediate superior.   It was but natural that their official relations should bring them into close contact with each other.

The mere fact that McGoey was seen several times in the company of Doyle, in and by itself, has no weight as evidence that they were engaged in any conspiracy, and this court would not be justified in so holding without proof as to what was discussed by them.

There is nothing in the testimony of Commissioner Drennan which would seem to indicate that the relations between Doyle and McGinniss and between Doyle and McGoey tend to establish any criminal conduct on the part of Doyle.

In People v. Courtney (28 Hun 589, 593, 8 N. Y. Crim. 355), Mr. Justice BRADY, writing for the court, said: "The language of the statute, as we have seen, is that the accomplice must be corroborated by such other evidence as tends to connect the defendant with the commission of the crime. *The existence of intimate relations is not a circumstance from which participation in the guilty acts of an associate is to be presumed, because it is consistent with innocence.* The association may be continued, and may be marked by all the circumstances which characterize the association of the accomplice and the appellant herein, and yet be an innocent one. In other words, the appellant might not have been advised in any way of the intended crime by the accomplice. It is not in the language of the section, such other evidence as tends to connect the appellant with the commission of the crime."

This case is cited with approval in People v. Kathan, 136 App. Div. 303, 308, 24 N. Y. Crim. 279.

In People v. O'Farrell (*supra*), the court held that the mere fact that the defendant was shown to be with one of the accomplices in a place and under circumstances where he might have assisted in its commission, and that he loaned one of the accomplices his overcoat, does not constitute corroboratory evidence which justified the submission of the case to the jury.

In Ormsby v. People (53 N. Y. 472, 474), the court held that where the proof showed that the defendant and two other persons entered a department store and one of them stole a shawl, the fact that the defendant was in the company of the person who stole the article was insufficient proof to connect her with the larceny.

GROVER, J., writing the opinion, said: "My conclusion is, that the proof was not sufficient; it amounted to this, that the plaintiff knew them and came into the store with them; that the two professed a desire to purchase India shawls; that the plaintiff in error expressed a wish to purchase a cheap woolen

shawl, which appears to have been true, as she actually made such purchase before she had any information that any theft had been committed. Her coming in company with the others, while well calculated to excite suspicion, was no evidence that she knew or suspected that they, or either of them, had any design to steal. Her so coming in was consistent with her entire innocency, and being so was not proof of guilt."

3. The People called one Benjamin Uberall for the purpose of corroborating the Wallaces to the effect that they met the defendants Doyle and McGoey at Healy's Sixty-sixth street restaurant one evening in November, 1918.

This witness testified that he was the manager of that restaurant; that he could not state with any certainty the date on which he saw the defendant Wallace at a table seated with Doyle and McGoey in this restaurant but he thought that it was about two or three months prior to the grand jury investigation; that he was introduced by the defendant Wallace to Doyle; that he complained of a headache and Doyle advised him to take aspirin tablets; that this was the only time that he saw Wallace and the defendants Doyle and McGoey together; and that he did not hear any talk among those parties concerning the business of the Columbus Film Exchange.

This witness was not asked by the district attorney whether Mrs. Wallace was present at that conference.

At most this witness' testimony shows that McGoey and Doyle dined in a public restaurant. There was nothing said or done that night, as testified to by Uberall, which tends to support the testimony of the Wallaces. (See People v. Courtney and People v. O'Farrell, supra.)

4. It is claimed by the district attorney that Doyle's guilt is shown by the fact that he called a meeting of the exhibitors at which the fire commissioner denounced the practice of the giving of graft to individual firemen, and expressed his confidence in Doyle and McGinniss.

On the contrary, the record shows that Commissioner Drennan particularly stated to the exhibitors *" that the practice of paying money to inspectors or to any one else had to stop; "* that he was going to stamp it out; that he was going to prosecute the bribe giver to the limit, and in that way stop the bribery of public officials connected with the fire department.

He testified, among other things, as follows: " Q. What was your conversation with Doyle about that meeting, when he came in and told you about it; what did he say? A. He said, ' I have a number of these moving picture men out here. Suppose you come and talk to them.' Q. Did you hear Dr. Doyle say anything to them? A. Yes, sir. Q. What, in effect, did he say to them, generally? A. That the trouble he was having, that they were overcrowding their places and complaints had been made and the commissioner was finding fault about it or something, and he had brought them there to have the commissioner talk to them. It was in that tenor if I remember right. Q. Then you went in and did address them? A. Yes, sir, and tried to make them see a light, tried to make them feel that the mistake they were making in crowding their houses and the dangers they were running was going to bring on their head more drastic ordinances than we have now, and told them as long as they would act half decent we didn't propose to nag them but we proposed to see they kept their places clean and decent from a fire department point of view. Q. What did you say to them, if anything, about payment of money? A. I told them that this practice — *that the practice of paying money to inspectors or to any one else had to stop,* and I told them something that was not so; I told them I had taken this matter up with the police commissioner, the district attorney and various civic bodies and we came to this conclusion, that we were going to stamp out this practice, that we weren't going to prosecute the bribe taker, but if we could get a case of a bribe giver, a man that gave the money, that was the man we were going to prosecute to the

limit, and that in that way I could stop the practice. Regardless of how my talk to these men has been distorted I believe it brought the information to me. I think that is what brought it to a head, because these fellows — there may have been very few of them, but there were a few — that were fearful of being prosecuted if they gave the money. Q. After this talk of yours some of the exhibitors reported that they were paying this money? A. Yes, sir. The people I got it from were the people that were complaining they didn't know what to do. They were afraid not to pay and if they did pay they would be prosecuted, and I believe this is the crux of the thing: if we could prosecute some of these bribe givers we could stamp out this petty graft in every department in the city."

The argument of the district attorney that the defendant Doyle had a sinister purpose in requesting the commissioner to address the representatives of the motion picture theatres is without any merit.

It is incredible that if Doyle were a conspirator he would risk the possibility of having some exhibitor accuse him or McGinniss of being behind a movement to collect graft. Would Doyle have exposed himself to such danger?

I am at a loss to understand why Doyle, if he were a graft collector, should deem it necessary to have the commissioner give the exhibitors the very advice which would not only defeat the purpose for which the Columbus Film Exchange was organized, but would expose him likewise to the hazard of a criminal prosecution.

Some of the exhibitors testified before the grand jury that they had been in the habit of paying tribute to firemen long before the Columbus Film Exchange came into existence and, in my opinion, if Doyle desired to levy tribute upon the exhibitors, all that was necessary to carry out his purpose was to notify them of the filing of violations. This method would have been ample to carry out his criminal purpose.

Instead of this meeting tending to connect Doyle with the Columbus Film Exchange, as claimed by the district attorney, in my judgment it strongly tends to establish the contrary.

It seems to me that the calling of this meeting by Doyle was an honest effort on his part to discourage the practice on the part of exhibitors paying tribute to any one.

5. It is contended by the district attorney that out of the thirty-four " pigeon-holed " violations found in the desk of McGinniss by the fire commissioner and seized by him, nineteen related to the representatives of the motion picture theatres who had transactions with the Columbus Film Exchange, and that the statement made by McGinniss to firemen Quinn and Condren and certain entries contained in an unofficial book and on a certain list of violations prepared at the direction of McGinniss and furnished to the commissioner to the effect that these violations were " held by the order of Chief Doyle " implicate the latter and tend strongly to corroborate the accomplices.

An analysis of this contention will demonstrate that it is unwarranted by the proof.

It should be borne in mind that all violations were first brought to the attention of McGinniss as they were originally filed in his bureau.

On this subject, the fire commissioner's testimony is as follows: " Q. You say you then went over to Captain McGinniss's desk and on his desk you did find a number of complaints or violations which had not been forwarded to the corporation counsel? A. I found those papers I delivered over to you. Q. These papers I hold in my hand which you turned over subsequently to the district attorney? A. Yes, sir. Q. I show you these violations which you found in Captain McGinniss's desk as you indicate, and will you plaese explain to the grand jury precisely what these endorsements on the back of those violations mean? A. These violations are turned in by the inspectors or the captain in charge has men in charge of the

Bureau of Public Assembly. There is an endorsement on the back here which reads: ' respectfully referred to the Chief of the Bureau of Fire Prevention with the recommendation that the within violation be forwarded to the corporation counsel for the collection of penalty.' That is signed. Then that is forwarded to the chief of the bureau of fire prevention. Q. Signed by the inspector? A. No; signed by the chief in charge of the Public Assembly, Captain McGinniss; but first signed by the inspector who places the violation. Q. Captain McGinniss is to forward them to Dr. Doyle, and Dr. Doyle's business is to transmit them to the corporation counsel? A. Yes, sir. Q. Is Dr. Doyle's desk in the same office with Captain McGinniss? A. No, it is not. Q. In another part of the building. Captain McGinniss's business is to take those violations to Dr. Doyle's office? A. Yes, sir. Q. He didn't do it in this case? A. Evidently not, because they were in McGinniss's desk. Q. Whose duty was it to forward these violations to the corporation counsel; whose duty was it in your office? A. He was the head of that bureau, Dr. Doyle. He may have delegated that work to some clerk, but the responsibility was his."

The district attorney observing that this testimony would be futile as against Doyle without further proof that he had guilty knowledge of the existence of such violations attempted to establish that fact, but he did so through the introduction of illegal testimony, which was furnished by the fire commissioner, and is as follows: " Q. Joseph F. Demol, engineer detailed to the Bureau of Public Assembly, is the driver? A. Driver for Dr. Doyle. Q. *And this is his signature here as witness?.* A. *I could not say that is his signature. I assume it is.* Q. Take this particular violation against premises owned by Grant W. Anson, which you found in the desk of Captain McGinniss, I note down there ' witness William F. Doyle.' What is the meaning of that? A. As I understand, Dr. Doyle went out at night ostensibly to clean this moving picture business up and Demol

was his chauffeur. They would enter a moving picture house and if they found a violation he would direct Demol to prepare the violation, make it out, and place him as a witness to the fact that they had so many standees or some other violation such as the booth might be open, or whatever violation they placed against them. He was the witness to Demol's charge. Q. So that Dr. Doyle must have known these violations were in existence? A. Yes, sir. He got them himself. He is marked there as a witness."

There are three strong and valid objections to the admission of this testimony:

(a) Without proof of the handwriting of Demol the filing of the violation should not be chargeable to Doyle;

(b) It was highly prejudicial for the fire commissioner to state " that Dr. Doyle went out at night ostensibly to clean this moving picture business," as the effect of this testimony manifestly must have instilled a hostile feeling in the minds of the grand jurors that Doyle was a faithless public servant. Such a statement coming from the fire commissioner undoubtedly created an atmosphere against Doyle which prevented an impartial consideration of the charges against him; and,

(c) The statement by the fire commissioner that Doyle must have known that these violations were in existence constitutes an expression of opinion and a conclusion by this witness.

As I am constrained to disregard this illegal testimony, I find absolutely nothing in the record which warrants me in holding that Doyle had any guilty knowledge that McGinniss was in possession of the so-called pigeon-holed violations. If McGinniss willfully withheld from his superior any information as to the existence of the violations it is manifest that such conduct on the part of McGinniss cannot be imputable to Doyle, unless they were co-conspirators.

While the withholding of the violations may be some evidence against McGinniss, yet it is no proof against Doyle bacuse of

the failure of the district attorney to connect him with the conspiracy.

The only testimony in the record that I am able to find against Doyle comes from accomplices who are uncorroborated and therefore such testimony is insufficient to establish the crimes against Doyle. "Insufficient evidence is, in the eye of the law, no evidence." (Matter of Case, 214 N. Y. 199, 203.)

When a conspiracy is shown then the acts and declarations of a co-conspirator in furtherance of its purpose and object are competent and binding, not only on the co-conspirator committing the acts or making the declarations, but also against all the other conspirators. (People v. Miles, 123 App. Div. 862, affd., 192 N. Y. 541; People v. McKane, 143 id. 455; People v. Becker, 215 id. 126.)

It not being shown that Doyle was a member of the conspiracy, the declaration alleged to have been made by McGinniss to firemen Quinn and Condren and the entry in the book and on the list of the violations furnished to the commissioner to the effect "that the violations were held by the order of Commissioner Doyle" were as to him purely hearsay and inadmissible.

6. On February 27, 1919, the fire commissioner directed Doyle to furnish him "with a list of all violations that had been placed against theatres or moving picture houses for the previous ninety days and as to what disposition had been made of them." In response to such order, Doyle furnished the commissioner with a list signed by Captain Frank H. McGinniss. This list, which is known as Exhibit 8, had the following caption:

"February 27th, 1919. List of Violations Found and Forwarded up to date, December, 1918, January and February, 1919."

Under this caption there appeared in columns the addresses of certain moving picture houses and dates.

It is asserted by the district attorney that this list had been

carefully prepared with the deliberate intention to conceal from the commissioner the fact that the seized violations were pigeon-holed; that it did not contain a record of the dispositions as requested by the commissioner; that the word " forwarded " in the caption was false and misleading; that many of the viola-tions set out had not been forwarded; and that the dates set out ostensibly to indicate the time of " forwarding " were in fact dates of finding.

The commissioner being dissatisfied with this list caused an investigation to be made with the result that he found in the office of McGinniss another list which, according to the record, was prepared under the direction of McGinniss. This list, known as Exhibit 12, is referred to as the " honest list " and contained the following caption: " February 27th, 1919. Vio-lations found and forwarded up to date, December, 1918, Jan-uary and February, 1919," with a column of addresses of mov-ing picture houses underneath, but with three additional col-umns containing dates " found, forwarded and held."

Under the heading " found " was the true date of the finding of the violation. Under the heading " forwarded " was the true date of the forwarding of the violations to the corporation coun-sel for prosecution. Under the heading " held " was indicated the fact that particular violations were held, in addition to which it contained a memorandum to the effect that certain violations were " held by orders of Chief Doyle." All of this information was eliminated from the false and misleading list presented to the commissioner.

The minutes of the grand jury show that the only person who had charge of the preparation of both lists was McGinniss, and also that the lists were prepared from books and records kept in his office. There is not a particle of proof that Doyle directed McGinniss or any other subordinate to prepare a false or mis-leading list of violations.

When the commissioner ordered Doyle to furnish him with a

list of violations, he had necessarily to rely upon McGinniss who was the only official in possession of the available information, and the list of violations which Doyle delivered to the commissioner was the one which was prepared and signed by McGinniss.'

So far as the minutes show there is nothing to indicate that Doyle had the slightest idea that Exhibit 8 contained false or misleading information. If a fraud was attempted to be perpetrated it is far fetched to say that Doyle sought to deceive the fire commissioner. Surely the head of a public bureau cannot be charged with failure to perform his duty unless he acted in bad faith, or willfully failed to perform a duty enjoined upon him by law, but so far as this is concerned, there is no evidence to that effect.

For the reasons expressed in this point, the presentation of the so-called misleading list by Doyle to the fire commissioner fails as a corroboratory circumstance of the testimony of the accomplices.

7. Commissioner Drennan testified that the only person to whom he spoke who was connected with the department concerning the Columbus Film Exchange was Doyle; that he did not speak to McGoey about it, nor with any other person in the bureau of public assembly.

Wallace testified that McGoey told him to close the business because " there seems to be some trouble about it."

The district attorney, therefore, deduces from testimony of both Commissioner Drennan and Wallace that the only person who could have told McGoey that the affairs of the Columbus Film Exchange were being investigated by the fire commissioner was Doyle, but although he examined the commissioner with great care as to whether he spoke with other persons in the department concerning the Columbus Film Exchange, he, nevertheless, failed to ask him whether he had spoken to any other person not affiliated with the department. This wide gap

in his testimony does not permit the inference that Doyle was the only person who could have conveyed such information to Wallace. It must necessarily follow that this circumstance is without probative value.

In People v. Razezics (206 N. Y. 249, 269), the court say: "Where the principal circumstance urged from which to infer guilt is wholly based upon an underlying circumstance or inference the testimony is unsatisfactory."

In Lamb v. Union R. Co. (195 N. Y. 260, 266), the court say: "It is a well-settled rule of law that you cannot base inference upon inference. (O'Gara v. Eisenlohr, 38 N. Y. 296; Ruppert v. Brooklyn H. R. R. Co., 154 N. Y. 90.) Every inference must stand upon some clear, direct evidence, and not upon some other inference or presumption."

8. In the middle of February, the fire commissioner heard rumors concerning the Columbus Film Exchange. He sent for Doyle and asked him if he had heard about the existence of this exchange, and Doyle replied that he had not. The commissioner then requested him to make an investigation and to report to him at the earliest opportunity. He reported the following to the commissioner: "I found that place; they are closed up; they are already stamped out; I found the man on the lease; don't ask me to tell you who it is. It will make you feel bad."

On Washington's birthday, Doyle finally told the commissioner that the defendant Wallace was the lessee.

The minutes disclose that the commissioner had never met nor heard of Wallace.

It is difficult to see upon what theory the district attorney reaches the conclusion that Doyle made a false report to his superior, unless he relies upon the testimony of the accomplices, but as has already been indicted, their testimony does not find any supporting proof.

At the time Doyle made the report the exchange had in fact

ceased to conduct any business, and the place was closed. What other report could Doyle have made under these circumstances? He made the only report which the facts justified.

The whole case against Doyle turns upon the testimony of persons who were accomplices as a matter of law, and I am compelled to reach the conclusion within the decisions that there was no proof before the grand jury aside from their testimony which tended to show that he was connected with the crimes, and therefore the grand jury was not justified in presenting him for trial.

Section 399 of the Code of Criminal Procedure provides that: "A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."

The fact that more than one accomplice testified against Doyle does not " remove the case from the effect of this section." People v. O'Farrell, *supra*.

The general and most important features of the case in so far as they relate to the defendant McGinniss have been discussed in the Doyle case and it remains therefore to be determined whether there was any evidence besides the testimony of the accomplices to implicate him in the crimes.

The corroborative evidence which the district attorney claims connects McGinniss may be grouped as follows:

1. The close relations which existed between him and an exhibitor named Bock, against whose theatres two violations were filed, but which were never pressed for prosecution; these violations were found " pigeon-holed " in McGinniss's desk.

2. The pigeon-holing of violations against subscribers to the exchange; and

3. The delivery of false and misleading reports by McGinniss to Doyle to be forwarded by the latter to Commissioner Drennan.

1. Samuel G. Bock, engaged in the motion picture business,

testified that he had known McGinniss for ten years; that McGinniss never suggested or asked him for any money, "not even for a nickel;" that he had been in the habit prior to the organization of the Columbus Film Exchange of paying graft to inspectors connected with the bureau of public assembly; that he did so for about seven or eight years; that he paid money to Inspector Conlon during the months of August, September, October and November, 1918; that he did not remember the names of other persons to whom he paid money, excepting a fireman named Kelly, but that he did not know whether he was connected with the bureau of fire prevention; that unless he paid money to firemen he could not conduct his business, and he produced certain canceled checks showing payments to firemen prior to the existence of the Columbus Film Exchange, and he testified that notwithstanding the fact that he made payments to firemen and inspectors, violations were nevertheless filed against his theatres.

The witness also testified that his partner received a telephonic message purporting to come from McGinniss requesting him to see Mr. Wallace at the Columbus Film Exchange and to pay his bill, and that he should also tell the other exhibitors to do likewise; that he saw Wallace in January and paid him forty dollars for two of his theatres; that in February he collected money from other exhibitors and turned it over to Wallace; that the money paid to Wallace was for "protection;" that in February he paid to Wallace on his own account forty dollars less fourteen dollars, because he (the witness) was obliged lawfully to pay the latter amount to the office of the corporation counsel in settlement of two violations.

He further testified that in the beginning of February he called on McGinniss and told him that he paid money to the Columbus Film Exchange for protection and asked him "whether he wasn't in on it, whether he wasn't part of that or couldn't help him settle the violations;" that McGinniss re-

plied " that he did not know anything about it; that the violations had gone through; that if he wanted to settle them he would have to settle them himself with the corporation counsel," and that McGinniss also said " that if the violations had come to him he might have been able to take care of them."

This witness, according to his own testimony, stamps himself as an accomplice, but there are other circumstances in the record which corroborate this corruptor of public officials in a material way so " that a belief in his credibility becomes reasonable and therefore safe to be entertained." (People v. Patrick, 182 N. Y. 131.)

It appears that McGinniss was advised by Bock that he had paid money to the Columbus Film Exchange for the sole purpose of preventing the prosecution of violations against the theatres in which he was interested; that McGinniss therefore had knowledge that the business with which Wallace was connected was not a *bona fide* organization; that he told Bock " that if the violations came to him he might have been able to take care of them; " that after Bock had paid money to Wallace there were two violations filed against two of the theatres in which he was interested, namely, " Heights " and the " Classic; " that one of the violations was filed against the Heights Theatre on January 26, 1919, and the other against the Classic Theatre on February 11, 1919. These violations were two of the nineteen which were pigeon-holed and found by the commissioner on McGinniss's desk on February 27, 1919, and they had not been forwarded to Doyle by McGinniss as required by the rules of the department.

These circumstances certainly have some tendency to corroborate the testimony of Bock and they seem to point to McGinniss as the public official who was concerned in the Columbus Film Exchange which was to serve as a medium for the collection of money from exhibitors to influence him in his official conduct.

2 and 3. While the pigeon-holing of the violations exonerates

Doyle for the reasons mentioned in the discussion of his case, yet, nevertheless, such fact does not exonerate McGinniss. It was McGinniss who, in the first instance, received the violations, and it was his duty within " three," " four " or " five " days to send them to Doyle.

The proof shows that McGinniss had in his possession two violations dated January eighteenth; one, January twenty-second, three, January twenty-seventh; three, January thirty-first; two, February eleventh; two, February seventeenth; three, February eighteenth, and three, February 21, 1919, which were not forwarded by him to Doyle. They were kept in his office until found by Commissioner Drennan. Was such failure to transmit these violations to Doyle negligent or intentional?

The fact that there were nineteen pigeon-holed violations against persons who paid money to Wallace is very significant. It permits the natural and reasonable inference that these violations were not pressed for prosecution, because the exhibitors against whom they were filed had paid money to Wallace.

This conclusion is irresistible, because McGinniss prepared two lists known as Exhibits 8 and 12, respectively.

Exhibit 8 was signed by him and was the list which he gave to Doyle who, in turn, delivered it to the fire commissioner. This exhibit, it will be remembered, did not contain the statement that the violations were " held by order of the defendant Doyle."

Exhibit 12, known as the " honest list " contained the information which was omitted from Exhibit 8. Exhibit 12 was unsigned by McGinniss, and was found in his desk by the commissioner.

The evidence shows that Exhibit 12 was the first list prepared, but it was never submitted to the fire commissioner.

The reason is apparent, for the commissioner would at once have perceived that certain violations against moving picture

houses had not been forwarded in due course to the corporation counsel for prosecution, and would have immediately called for an explanation on the part of McGinniss. If McGinniss had nothing to conceal from his superior, why was this deception practiced? Does the preparation of the false list show a consciousness of guilt?

The corroborative evidence against McGoey is more direct in its implications. There is nothing in the record to impugn the veracity of Florence McGrath. Her testimony directly connects him as the recipient of some of the proceeds paid by the exhibitors to the Columbus Film Exchange. On this subject she testified as follows: " Q. I now ask you if on any occasion at 144 Columbus avenue you paid any money to anybody other than Mr. Wallace? A. Yes, sir; I did. Q. To whom did you pay money? A. Mr. McGoey. Q. Do you know what his first name is? A. I think it is Frank. Q. Before you saw him in the Columbus Film Exchange had you ever seen him in any place? A. Yes, sir. Q. Where? A. At Healy's Restaurant. Q. At 66th Street where you were employed? A. Yes, sir. Q. How much money did you give McGoey at the Columbus Film Exchange? A. It was over $100. Q. Do your know the occasion of when it was or how it came about? A. Mr. Wallace was ill at the time and McGoey came up and took the money. Q. When he came up what did he say to you? A. He said he was up there for the money; that is all. Q. Did you turn over to him all the money you had on hand? A. Yes, sir. Q. For what period of time did that money represent? A. I just could not say. Q. Would you say it was a day or two days? A. I think the receipts for two days. Q. About two days' receipts, and you turned that over to Frank McGoey? A. Yes, sir. Q. Was this in the month of January or February that you paid him the money? A. Latter part of January."

As to what took place between McGoey and Miss McGrath at the time that he called upon her for the money Wallace

testified as follows: "Q. Thereafter did you hear from him as to whether he had gone up or not? A. Oh, yes. Q. What talk did you have on that subject? A. He called me up that night when he came back and said he had been up there and that the girl was just about ready to go home when he came in, and that she was very nervous about carrying the money around with her. Q. Did he tell you how much he had received? A. He told me but I don't recall the exact amount; in the neighborhood of $280 or $300."

The testimony of Miss McGrath, if credited, is conclusive.

In my opinion, the People have offered sufficient corroborative proof of a circumstantial and direct character to support the testimony of the accomplices and to connect the defendants McGinniss and McGoey with the transactions set forth in the indictments.

Of course, each circumstance taken by itself might not be sufficient, but when considered together they certainly have some tendency to corroborate the evidence of the accomplices in material particulars. The law places no other burden upon the People and when the corroborative evidence of the accomplices fairly tends to connect the defendants with the commission of the crimes, then the sufficiency of the corroborative evidence of the accomplices must be determined by the jury.

In People v. Elliott (106 N. Y. 288, 292), the court said: "Each circumstance taken by itself is quite inconclusive, but when considered together they certainly furnish some corroborative evidence. It is not necessary that the corroborative evidence of itself should be sufficient to show the commission of the crime, or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime. Nor need the corroborative evidence be wholly inconsistent with the theory of the defendant's innocence. The court before it should submit the case to the jury should be satisfied that there is some corroborative evidence fairly tending to con-

nect the defendant with the commission of the crime, and when there is, then it is for the jury to determine whether the corroboration is sufficient to satisfy them of the defendant's guilt."

In People v. Everhardt (104 N. Y. 591, 594), the court said: " The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime so that his conviction will not rest entirely upon the evidence of the accomplice."

Finally there remain to be considered some of the questions urged by the defendants with respect to the admission of illegal and incompetent testimony which they claim substantially affected their rights before the grand jury.

1. They assert that the fire commissioner in his testimony was permitted by the district attorney to testify as to conversations had between the defendant Wallace and Assistant District Attorney Talley in the absence of the other defendants.

The district attorney concedes that while, to a certain extent, this criticism is justifiable, nevertheless, he says the error was cured because Wallace himself substantially testified to the particulars mentioned by the fire commissioner.

It is permissible to corroborate the testimony of an accomplice by proof of his prior consistent statements, under certain circumstances, but the conditions under which such testimony is admissible were not developed by the district attorney in this proceeding, and therefore such testimony by Commissioner Drennan was clearly objectionable and the district attorney should not have questioned the fire commissioner concerning such anterior statements. (People v. Katz, 209 N. Y. 311, 30 N. Y. Crim. 373, and cases cited therein; People v. Jung Hing, 212 id. 393, 31 N. Y. Crim. 449.) This testimony, while admissible as against Wallace, was not as against the other defendants.

2. The people presented proof tending to show that prior to the organization of the Columbus Film Exchange some of the

exhibitors had bribed firemen. It was error to have offered such proof inasmuch as there was absolutely no evidence connecting any of the defendants with such crimes. (People v. Molineux, 168 N. Y. 264, 16 N. Y. Crim. 120; People v. Grutz, 212 id. 72, 31 N. Y. Crim. 302.)

3. Certain exhibitors were permitted to testify that they had heard rumors to the effect that if they did business with the Columbus Film Exchange, they would receive favors and consideration from the fire department. This testimony was purely hearsay and should not have been received.

4. While it must be conceded that illegal testimony was admitted against McGinniss and McGoey, some of it of a very prejudicial character, nevertheless, they are not entitled to a dismissal of the indictments, unless it clearly appears that the illegal evidence improperly influenced the minds of the grand jurors. (People v. Farrell, 20 Misc. Rep. 213; People v. Molineux, 27 id. 79; People v. Sexton, 42 id. 312.)

From a careful analysis of the record I am satisfied that this evidence did not contribute to the finding of the indictments, and that, therefore, their rights were not seriously affected.

There is sufficient legal evidence in the record to permit two of the indictments to stand, and the defendants McGinniss and McGoey to be tried thereon.

In People v. Sexton (*supra*), Mr. Justice DAVY said: " Even if the evidence was incompetent it does not vitiate the indictment, as there is sufficient legal evidence with the children's testimony stricken out to sustain it.

" The courts are not called upon to sit in review of the investigations of a grand jury as upon the review of a trial when error is alleged; but in cases where the court can see that the indictment was based wholly upon incompetent evidence, then it should be set aside. Grand juries do not try the issues, but inquire and determine whether a crime has been committed; they do not condemn, but only accuse, and it would be unwise

in practice to confine them to technical rules of evidence. (Hope v. People, 83 N. Y. 418; People v. Edwards, 25 N. Y. Supp. 480; People v. Willis, 23 Misc. Rep. 572.)

"Underhill in his work on Criminal Evidence, section 26, lays down the following rule: 'It should be remembered, however, that the testimony goes before the grand jury in the absence of the judge, and very often while the prosecuting officer is not in the room. Hence, to confine grand juries to the technical rules of evidence may be intolerable in practice. As a general rule the fact that some incompetent evidence was received in connection with competent evidence, or an incompetent witness examined, is not ground for quashing an indictment, since these errors may be corrected on the trial.'

"The grand jury ought not to be required to conduct its proceedings with the same strictness as would prevail at the trial. Such a requirement would be fatal to our present system of prosecuting criminal actions by indictment." To the same effect, see People v. Glen, 173 N. Y. 395, 17 N. Y. Crim. 225; People v. Sexton, 187 id. 495.

5. The challenge of the defendants as to the sufficiency of the indictments cannot be considered upon this application. The objections urged by them should be raised by demurrer. (Code Crim. Pro., § 323; People v. Grutz, 212 N. Y. 72, 31 N. Y. Crim. 302.)

Other matters are pressed upon my attention by the able and zealous counsel representing the defendants, but I do not regard them as of sufficient merit to require any answer.

The following disposition is made with respect to the several applications of the defendants:

1. The motion of the defendant Doyle to set aside the three indictments is granted, but with leave to the district attorney to resubmit the charges to the same or another grand jury, provided he can obtain legal evidence which would connect him with the crimes.

2. Inasmuch as there was no legal evidence presented showing that McGinniss and McGoey aided and abetted Doyle, it must necessarily follow that their motion in relation to the Doyle indictment, in which he is charged with a violation of section 1826 of the Penal Law, must also be granted, but with leave to the district attorney to resubmit the charge as against them, to the same or another grand jury, provided he can also obtain legal evidence which would connect them with the crime.

3. The motions made by the defendants McGinniss and McGoey to dismiss the indictment charging them with the crime of conspiracy, and the indictment charging McGinniss with the violation of section 1826 of the Penal Law in which McGoey is also charged with aiding and abetting him in the commission of that crime are denied.

Ordered accordingly.